SIDWAY v. THE MISSOURI LAND & LIVE STOCK
COMPANY, LIMITED, Appellant.

### Division Two, June 11, 1901.

1. **Pleading:** PETITION: MOTION TO MAKE CERTAIN. Under Revised
Statutes 1899, section 612, making it the duty of the court to re-
quire pleadings which are indefinite to be made more definite and
certain, it is not necessary for a defendant to file a motion to make
a petition more definite and certain, in order to raise the question
of its uncertainty and indefiniteness.

2. ———: CONSTRUCTION. The Revised Statutes 1899, section 629,
requiring pleadings to be liberally construed, does not throw on an
adversary the hazard of correctly interpreting the meaning of a
pleading containing doubtful and uncertain allegations; such statute
extending only to the *form*, and not to the fundamental require-
ments, of pleading.

3. ———: PETITION: STATEMENT OF FACTS: SUFFICIENCY UNDER. Re-
vised Statutes 1899, section 592, requiring that the petition in an ac-
tion shall contain a plain and concise statement of the facts constitut-
ing the cause of action, and section 612 providing that the precise
nature of the charge must be apparent, a petition for work and labor
done and money advanced which fails to set forth the character of
the work, and the authority by which it was rendered, and the pur-
pose for which or person to whom the money was advanced, is in-
sufficient.

4. ———: STATUTORY PROVISIONS: REJOINDER. Under Revised Stat-
utes 1899, section 628, providing that the allegation of new matter
in the reply shall be deemed controverted by the adverse party, as
on a direct denial or avoidance; section 596, providing that the
only pleading on the part of a defendant is either demurrer or an-
swer; section 607, providing that defendant may demur to a reply;
and section 609, providing that when a replication shall be filed
the cause shall be deemed at issue—there is no necessity of a re-
joinder on the part of the defendant.

Sidway v. Missouri Land and Live Stock Co.

5. **Instructions:** MULTIPLICITY: GROUND FOR REVERSAL. The giving of instructions which, when printed, cover nine and one-half pages, is ground for reversal of the judgment; the effect being not to instruct, but to confuse, the jury, so as to make their verdict mere guesswork.

6. ———: SERVICES RENDERED: QUESTION AS TO GRATUITY: BURDEN OF PROOF. In an action for alleged services, in the management of defendant company's business and in selling their lands, and for money advanced for such company in making certain trips, of which company plaintiff was a shareholder, defendant averred that the services were gratuitous, and introduced letters written by plaintiff to other shareholders and the directors in which he said that, though not connected with the management, he would undertake to represent the shareholders in certain matters; further, that he made certain trips at his own option and expense; and, also, "I get no pay from the company for any services." The books of a firm, of which plaintiff was a partner, engaged in selling land, contained no charge for selling lands for the company; nor did he lay claim for services rendered until many years thereafter. *Held*, that there was no basis for an instruction, given at plaintiff's instance, that the burden was on defendant to show that the services were gratuitously performed.

7. ———: MISLEADING. An instruction in such action that though the jury might believe that plaintiff, in the course of his correspondence with the shareholders and directors, "casually used expressions" to them which implied that he was not receiving compensation, yet, under certain circumstances mentioned, the verdict should be for plaintiff, was misleading, since no such statements, as employed by plaintiff, could be deemed "casually-used expressions," and hence ground for reversal.

8. **Witness:** ACTS AND STATEMENTS OF DECEASED PERSONS. In an action against a corporation for services rendered and money alleged as having been paid for its use, plaintiff, testifying in his own behalf, can not give evidence as to any acts or words of the manager of such company, who has since died.

Appeal from Newton Circuit Court.—*Hon. J. C. Lamson,* Judge.

REVERSED AND REMANDED.

*Geo. Hubbert* for appellant.

(1)   (a) The court erred in abandoning its previous order requiring definite statement of facts by plaintiff's petition and in overruling appellant's motion to strike out respondent's second amended petition.   This becomes more apparent as we see the confusion resulting from the lack of certainty, in the course of the trial and in the effects of the verdict on the first count.   (b)   And it erred in permitting respondent to make further amendment of his petition, changing the issues, after the jury was sworn.   (c)   And in permitting respondent to testify to Pollock's actions in behalf of appellant, when that manager had died in the meantime.   (d)   And in overruling respondent's objection to the respondent's evidence of specific agreement or request of service not pleaded.   (2) The intention of one party alone can not raise an implication of contractual intention to pay for services rendered.   In the absence of an express promise to pay, both parties must concur in the intention, at the time of service, that it shall be paid for by the recipient, that is, the facts must be such as imply such mutual concurrence at least.   And no subsequent change of intent on either side will change the right, or for the first time raise a right, to recover.   Kinner v. Tschirpe, 54 Mo. App. 575; Bittrick v. Gilmore, 53 Mo. App. 53; Hart v. Hart, 41 Mo. 441; Lippman v. Tittman, 31 Mo. App. 69; Guenther v. Birkicht, 22 Mo. 439; Woods v. Land, 30 Mo. App. 176.   (3)   It is an invasion of the province of the jury to assume that admissions are casual, and to give for that reason an instruction of caution to the jury.   Davis v. Hardy, 76 Ind. 272; Unruh v. State, 105 Ind. 117; s. c., 4 N. E. 453; Castleman v. Sherry, 42 Tex. 59; Com. v. Galligan, 113 Mass. 202; Mauro v. Platt, 62 Ill. 450; 2 Thomp. Trials, sec. 2431.   (4)   The great multiplicity of the in-

structions, on the subject of respondent's services alone, was confusing, and it should seem that it would be reversible error to give such a lot of instructions, which the court would have been justified in refusing to give by reason of such multiplicity. Crawshaw v. Sumner, 56 Mo. 517; Buck v. Railroad, 108 Mo. 179; Hickman v. Link, 116 Mo. 123; Girard v. St. Louis Co., 46 Mo. App. 79. (5) It is reversible error to give conflicting instructions, as was done in this case. State v. Herrell, 97 Mo. 105; Frank v. Railroad, 57 Mo. App. 181; Redpath v. Lawrence, 42 Mo. App. 101; Voegeli v. Pickel Co., 49 Mo. App. 643; Stone v. Hunt, 94 Mo. 475. (6) And the erroneous or contradictory instructions can not be regarded as having been cured by correct ones given. Welch v. Railroad, 20 Mo. App. 477; State v. Cable, 117 Mo. 380; State v. Brumley, 53 Mo. App. 127; Gregory v. Sitlington, 54 Mo. App. 60. (7) Assumption of facts, or implied comments on part of the evidence, such as the assumption in this case, by instruction 19, that expressions used by respondent in his correspondence as put in evidence, were merely "casually used expressions" are always reversible errors. Wilkerson v. Eilers, 114 Mo. 245; Oil Well Co. v. Wolfe, 127 Mo. 616; Chouteau v. Jupiter Works, 83 Mo. 73; Fullerton v. Fordice, 121 Mo. 1; State v. Breeden, 58 Mo. 507; Jones v. Jones, 57 Mo. 138; State to use v. Mason, 96 Mo. 559; Peck v. Ritchey, 66 Mo. 114.

*W. Cloud* and *Benton & Sturgis* for respondent.

(1) On reading the petition and itemized statement filed with it, together with the affidavit, the court held it sufficiently definite. The defendant then went to trial and the length of the trial and volume of evidence admitted show that the defendant knew every detail of the case and was not harmed

by this action of the court. It has failed to point out in what respect the petition was too indefinite or how it was injured by the court's action. Sauter v. Leveridge, 103 Mo. 615. (2) As to permitting amendment of the petition. This was done simply to correct a clerical error in date. Defendant does not even suggest how it was hurt by this change of date from 1882 to 1884. (3) As to evidence of Pollock's "actions," he being dead. The evidence objected to was not concerning any of "Pollock's actions in behalf of appellant." The plaintiff was only testifying as to his own acts and services for defendant in which Pollock was incidentally mentioned. (4) As to admitting evidence of "specific agreement" of service not pleaded. When defendant devotes so much of his brief endeavoring to show that there is no evidence from which the jury could even infer an agreement for services, it is hardly consistent for it to ask that the case be reversed because the trial court admitted evidence of "specific agreement or request for service." If the evidence objected to and admitted by the court does prove a specific contract for services, then it is stronger even than plaintiff has contended. (5) It is not ground for reversal that instructions authorizing a verdict for plaintiff on his theory of the case do not embrace in the same instructions facts constituting defendant's theory, where defendant's theory is properly presented in his own instructions. State ex rel. v. Hope, 102 Mo. 410. And the fact that one of them standing alone would be misleading will not cause a reversal. Deweese v. Meremac Iron Co., 54 Mo. App. 476; s. c., 128 Mo. 423. (6) Where a series of instructions taken together contain a complete exposition of the law and cover every phase of the case the verdict will be sustained though the instructions when taken separately may be incomplete and each is not qualified by an express reference

to the other. Owens v. Railroad, 95 Mo. 169; Hughes v. Railroad, 127 Mo. 447. (7) Instructions are to be read together as a whole and their meaning to be collected from the whole context and not from detached instructions or phrases; and, if, when so treated, their meaning is obvious and legal principles announced correct, they are safe guides for a jury, even though subject to verbal criticism. Reilly v. Railroad, 94 Mo. 600; Shortel v. St. Joseph, 104 Mo. 114; O'Connel v. Railroad, 106 Mo. 482; Meadows v. Pac. Mut. Ins. Co., 129 Mo. 76. And in such case it is not error to refuse other correct instructions. Boller v. Cohen, 42 Mo. App. 97 .

SHERWOOD, P. J.—Action by plaintiff brought March 3, 1896, for alleged service, management, etc., and for cash said to have been paid to one Dummitt on behalf of the defendant company. These matters were mingled together in vexatious and inextricable confusion in the first count of the petition with no particulars as to the character of the services rendered, or by whom or under what contract or authority rendered, or in what circumstances or under what authority, on what account, for what purpose, to what person or persons, the money was loaned, paid, advanced or disbursed.

The first count averred that $11,300 was due for services rendered and $4,600 for cash expended, etc., with a credit of $894.50, leaving a balance due of $15,005.50. The second count for $1,000, for the purchase of goats, alleged to have been taken possession of by defendant company and converted to its own use.

Plaintiff promoted a corporation in Scotland with a capital stock of 30,000 shares at five pounds per share, for the purchase of 340,000 acres of land in Southern Missouri. He held an option on the land from the Frisco Railway Company

at $1.05 per acre and sold the same to the foreign corporation at $1.50 per acre, plaintiff holding 4,000 shares of the capital stock of the corporation.

At the time of the incorporation in 1881, plaintiff as a large holder of stock, living in America and being familiar with the country, agreed to look after the interest of the company until it was on a paying basis, and also suggested a stock farm or ranch of about 2,700 acres of the land in Newton county. The ranch feature proved a losing venture, causing much dissatisfaction among the shareholders, so that in 1885, the resident manager, appointed by the board of directors in Scotland, resigned his position and the plaintiff took charge of the ranch and ran it two years with no improvement in its condition, so that in 1887, the farm was leased to one Dummitt and the stock on the ranch sold to him, the company taking a mortgage on the same with plaintiff as surety on a certain bond. There is no written agreement of compensation for services, nor is there a written contract that certain moneys should be furnished the lessee.

The *causa causans* of this suit being brought by plaintiff, arose in this way: When defendant company asserted that a default in, and breach of, the conditions of the bond had occurred, and demanded payment of $3,000 and interest, it occurred to plaintiff that defendant company was owing him for services rendered, money advanced, paid over, loaned and disbursed for years and years, and no mention ever made of it before by him to the company. With his remembrance thus quickened and refreshed, this suit was brought by plaintiff.

Plaintiff filed an amended petition. To this amended petition defendant company filed a motion to make the same, as well as the bill of particulars therein, more definite and certain, which motion was based on the indefinite, uncertain and ambiguous allegations, substantially as set forth in the original

petition. This motion the court granted, and in furtherance thereof, entered the following order: "Comes now the defendant by its attorney, George Hubbert, who calls up the motion . heretofore filed herein for the making plaintiff's amended petition more definite and certain; and the plaintiff also appearing to the said motion by his attorneys, Cloud & Davis, and the said motion and argument of the attorneys thereon being fully heard and understood, the court doth rule for defendant and sustain the said motion; and plaintiff is therefore ordered and required to make his said petition and statement of particulars more definite and certain by setting out distinctly the items and facts for and on account of which the action is brought, with definite specification as to the character of the alleged services of plaintiff, where, and under what employment rendered, the prices thereof, and by what means fixed and with definite specifications and of the particulars cash claimed for, the several sums, when, on what account, for what purpose, by what authority, under what contract and to what person, loaned, paid, advanced or disbursed; and that such certainty be attained by amendments of petition filed in the office of the clerk of this court, etc."

In ostensible compliance with this order, plaintiff filed his second amended petition:

"Comes now the plaintiff in the above entitled cause and for his second amended petition and statement says that the defendant is now and was at all times hereinafter mentioned, a corporation duly organized and existing as such, having its organization and chief·office at Edinburg, Scotland, and has and usually keeps an office and agent for the transaction of its usual and customary business in Newton county, Missouri, and owning and holding large tracts of land in Newton and other counties in southwest Missouri, and during all said times was engaged in buying and selling said land, collecting the pur-

chase money therefor and in improving said land, advertising the same, erecting buildings and conducting farming operations and raising and buying and selling stock, and that plaintiff was engaged in business in Chicago, Illinois, and was skilled in the management and transaction of such business as the plaintiff was engaged in, and for cause of action plaintiff states that defendant is indebted to him for services rendered in and about the transaction of its business and for money loaned to defendant and for money had and received by defendant in the sum of fifteen thousand and five and 50-100 dollars, the items and debts whereof and credits thereon more fully appear from the itemized account herewith filed marked 'Exhibit C' and made a part hereof together with the statements following.

"That the services rendered as above stated were rendered at the special instance and request of and under the directions of the defendant and through its officers and agents and its president, secretary and managers, and directors, and with their knowledge and consent, and were valuable to defendant, and defendant received the benefit thereof and agreed to pay therefor whatever the same were reasonably worth, and the prices charged therefor are fixed by the reasonable value of such services upon a *quantum meruit.*

"That said services consisted in managing and assisting in managing and conducting the business of defendant in America, and in buying and selling lands for defendant and collecting the purchase money therefor, in keeping and overseeing the books and accounts of defendant, in managing and overseeing the farm of defendant and the live stock, and in counseling, aiding and advising the defendant in the management of its business generally in America, and to that end making numerous trips from Chicago to Newton county, Missouri, and other places and one trip to Edinburg, Scotland, all at the cost and expenditure of a large amount of time and money.

"That said services were rendered from the twenty-first day of March, 1882, continuously until the thirty-first day of December, 1895, and were reasonably worth the prices charged.

"That the items of cash loaned to defendant and the money had and received by defendant were paid to one F. R. Dummitt, who was an agent and employee of the defendant, acting in the capacity of a farmer and manager of a farm for defendant and were paid to him at the dates mentioned in said itemized account and were paid to him to be used and expended in and about the management of defendant's farm and for the purchase of supplies and live stock for said farm and the said various items of cash so advanced and paid to said Dummitt by plaintiff were advanced and paid on account of defendant, by and at the special instance and request of defendant, its directors and other officers and agents.

"That plaintiff has frequently demanded payment of all said items and sums of money and defendant has promised and agreed to pay the same, but has failed and neglected so to do.

"Wherefore, plaintiff prays judgment against defendant for the said sum of fifteen thousand and five and 50-100 dollars, and for costs of this suit.

"And for another and further cause of action plaintiff states that on the thirty-first day of December, 1893, he advanced to said F. R. Dummitt, while said Dummitt was in the employ of defendant in the capacity of a farmer with the knowledge, consent and concurrence of defendant, the sum of $1,000 for the purchase of goats, which it was agreed should be used by the said Dummitt on defendant's farm for the use and benefit of defendant for one year and then to be delivered to plaintiff.

"That said Dummitt purchased a large number of goats with said money as agreed, of the value of one thousand dollars, and placed same upon defendant's farm and used them

for the benefit of defendant.

"That afterwards defendant, with full knowledge of plaintiff's ownership thereof, took possession and charge of said goats and converted them to its own use, and although often requested to deliver them to plaintiff, has refused and neglected so to do, to the damage of plaintiff in the sum of one thousand dollars for which he asks judgment."

Accompanying this amended petition was filed the following:

### STATEMENT.

"The Missouri Land and Live Stock Co. (Limited) of Edinburg, Scotland, and Neosho, Missouri.
"In account with L. B. Sidway, Chicago, Illinois.

|  | Debits. | Credits. |
|---|---|---|
| December 31, 1886. To services rendered the company from May 21, 1882, to date ...... .........\$ | 900.00 | |
| December 31, 1887. To services rendered during the year ......... | 2,500.00 | |
| December 31, 1888. To services rendered during the year, including a trip to Edinburg ........... | 4,000.00 | |
| January 25, 1889. To cash paid F. R. Dummitt, for account company. | 300.00 | |
| August 28, 1889. Same .......... | 300.00 | |
| October 2, 1889. Same ........... | 300.00 | |
| October 29, 1889. Same ........... | 200.00 | |
| December 31, 1889. To services rendered during the year ......... | 1,200.00 | |

Sidway v. Missouri Land and Live Stock Co.

March 8, 1890. To cash paid F. R.
    Dummitt, for account company...$   100.00
July 10, 1890. Same ...........    100.00
September 15, 1890. Same ........   200.00
September 24, 1890. Same ........   100.00
December 4, 1890. Same .........   100.00
January 5, 1891. Same ..........   200.00
April 28, 1891. Same ............   600.00
July 8, 1891. Same ..............   100.00
January 4, 1892. Same ..........   200.00
January 27, 1892. Same .........   100.00
March 24, 1892. Same ...........   200.00
July 9, 1892. Same .............   100.00
November 23, 1892. Same ........   200.00
February 24, 1893. Same ........   100.00
December 31, 1893. Same ........  1,000.00
February 12, 1894. Same ..........   100.00
December 31, 1894. To services ren-
    dered during the years of 1890,
    1891, 1892, 1893 and 1894 at $500
    per year ....... ............  2,500.00
December 31, 1895. To services ren-
    dered during the year ..........   200.00
October 8, 1890. By cash received from
    F. R. Dummitt ..............       $  400 00
February 12, 1894. By cash received
    from F. R. Dummitt ..........        494.50
    By balance due ..............      15,005.50

                    $15,900.00$15,900.00

December 21, 1895. To balance .due
    L. B. Sidway ...............$15,005.50"
    Vol 163 mo—23

Then plaintiff filed a further amended bill of particulars with such second amended petition: whereby the first three items of the preceding statement were omitted as there written, and the following five items substituted therefor, viz.:

"Substituted items of bill of particulars.

Debits.

December 31, 1884. To services rendered from March 21, 1884, to December 31, 1884, in and about purchase of college lands for defendant.$ 100.00

December 31, 1885. To services rendered during year 1885 ........ .................. 300.00

December 31, 1886. To services rendered during year 1886 ...... .. ................ 500.00

December 31, 1887. To services during the year.. 2,500.00

December 31, 1888. To services during the year including trip to Edinburg.............. 4,000.00"

Otherwise the itemized statement is same as above set out in full, footings and balance being identical.

Thereupon, defendant filed a motion to strike out the second amended petition, to-wit:

"Defendant moves the court to strike out and from the files of this court the second amended petition, because the same is not in conformity to the requirements of the order of this court at its last term, in that said petition does not set out specifically the particular acts, facts, agreements, contracts, and grounds constituting plaintiff's cause of action in detail, as particularly provided and required by the said order."

To this motion of defendant, plaintiff responded by filing *a reply* in these words:

Sidway v. Missouri Land and Live Stock Co.

### PLAINTIFF'S RESPONSE AND AFFIDAVIT.

"Now comes the plaintiff in the above entitled cause and replying to defendant's motion to strike out plaintiff's second amended petition says that said petition sets out plaintiff's cause of action and the facts and grounds constituting same and the contracts on which same is based and with whom made as fully as the nature of the case will admit of and as fully as the law and rules of pleading require, and that the items of plaintiff's cause of action are sufficiently pleaded to advise and inform the defendant of the nature and character of plaintiff's demand, and to bar another action therefor.

"That the facts and circumstances out of which plaintiff's cause of action arise are peculiarly within the knowledge of defendant.

"Plaintiff further states that he has complied with the order of this court in substance and has complied with the established rules of law in relation to pleading and has complied literally with the order of the court, as nearly literally as it is possible from the nature of the case to do without pleading his evidence, and if the court is of the opinion that plaintiff has not complied with the exact letter of said order he asks that said order be modified by the court."

To this reply is appended this affidavit:

"L. B. Sidway, plaintiff in the above entitled cause, being duly sworn on oath states that he has stated the items and facts for and on account of which his action is brought as fully and specifically as the nature of the case will admit without pleading his evidence.

"That the facts and circumstances connected with plaintiff's employment and the nature of his services and when and where rendered are fully and peculiarly within the knowledge of defendant and its officers.

"That plaintiff's work and service was accomplished by successive acts each of which contributed to the accomplishment and completion thereof.

"That his demand will appear in part from the books and records of defendant kept by its officers and agents, and now in its possession, and are not accessible to plaintiff, and that the only information he has of such books and records is from the statements furnished by the defendant's officers and agents, and that full and itemized information can not be furnished without pleading a mass of correspondence between plaintiff and the officers and agents and employees of defendant, and of all which plaintiff has full and accurate knowledge.

"That plaintiff's services consisted largely of and included writing a vast number of letters and conducting a voluminous correspondence with the officers, agents and employees of defendant and in generally superintending and advising defendant's employees and agents in America and counseling and advising defendant's officers in Scotland who were remote from the lands defendant was engaged in selling.

"That a part of plaintiff's services consisted of managing and superintending the farm and farming operations of defendant and the live stock of defendant and in caring for and selling the same, detailed reports of which services defendant has in its possession from the letters and reports of plaintiff.

"That the exact amount of time spent in rendering such services and the attention and labor devoted thereto can not be reasonably itemized more fully than the same has been done.

"L. B. SIDWAY."

Whereupon, the court denied the motion of defendant to strike out, and the latter excepted. Upon this, defendant answered, and admitting its incorporation, entered a general denial of the other allegations of the petition; averred that

any services rendered by plaintiff were wholly voluntary and gratuitous, and so offered and understood at the time, and respecting which plaintiff never made or intimated any charge therefor. The statute of limitations was also pleaded. Counterclaims were also filed by defendant: First. For breach of bond aforesaid, damages in the sum of $4,170. Second. For failure of Dummitt to perform his contract to clear brush from farm, amounting in damages in the sum of $5,000. Third. For balance of purchase money of stock sold Dummitt, amounting to $5,756.68.

This answer covers more than *ten* closely printed pages.

The plaintiff then made reply in an instrument covering four printed pages. And then defendant came in and filed what is termed a *"rejoinder"* which "denies each and every allegation in plaintiff's reply to defendant's counterclaim."

The cause went to trial on the voluminous *acreage* of the pleadings; and the court at the instance of plaintiff gave *twenty-one* instructions, covering *six and one-half* printed pages to which defendant saved exceptions:

#### PLAINTIFF'S INSTRUCTIONS.

"1. You are instructed that in this case the plaintiff seeks in the first count of the petition to recover on an implied contract the reasonable value of his services alleged to have been performed for defendant at defendant's request, continuously from 1884 to 1895, inclusive, and also for money advanced by plaintiff to defendant from time to time from 1889 to 1894, inclusive, as set forth in his bill of particulars attached to his petition, which claims are denied by defendant's answer.

"You are further instructed that an implied contract is one in which the intention of the parties is gathered wholly or in part from the acts and deeds of the parties in connection

with surrounding circumstances as well as from their words. The law implies from conduct and actions promises as forcible and binding as those made by express words. When services of value are rendered at the request of another the law raises a presumption on the part of the person requesting such services, to pay therefor whatever such services are reasonably worth. And when services of value are rendered with the knowledge of another and without dissent on his part and the benefits of such services are accepted, a request to perform such services may be inferred and a promise to pay for the same by the person accepting such services will then be presumed.

"If, therefore, you find from the evidence that the plaintiff at the request of the defendant, expressed or inferred, rendered any of the services claimed in the petition of any value to the defendant, then plaintiff is entitled to recover the reasonable value of such services so rendered by plaintiff for defendant not exceeding $11,300, even though you may find that the defendant never, in expressed terms, promised to pay therefor.

"2.   You are further instructed that in this case the plaintiff seeks in the second count of the petition to recover from the defendant the value of a certain lot of goats belonging to him, alleged to have been converted by the defendant, which is denied by the defendant, in its answer; therefore, if you find from the evidence that the plaintiff was at the time the defendant took them, the owner of the goats mentioned in the evidence, as having been purchased by Dummitt for him, and that defendant took said goats and converted them to its own use and that defendant has not paid plaintiff therefor, then you will find for the plaintiff on the said second count of his petition for the reasonable value of the goats so converted, at the time they were converted, not to exceed the sum of $1,000.

"3.   You are instructed that if you find that a committee of the house of delegates of defendant, duly authorized for

that purpose made arrangements with the plaintiff by which he was to advance money on behalf of the defendant to F. R. Dummitt in connection with the lease of defendant's farm, and purchase of its stock, and that in pursuance of such agreement and arrangement the plaintiff did advance money to said Dummitt from time to time on behalf of the defendant, then you will find for plaintiff for such sums so advanced for defendant and not repaid to plaintiff, not to exceed $2,705.50, and the fact that both plaintiff and defendant at the time of such arrangement to advance such sums to Dummitt contemplated that such sums so advanced would be repaid to plaintiff out of the sale of the stock then on defendant's farm in the possession of said Dummitt, would not preclude plaintiff's recovery of said money from defendant so advanced for it, if such money was not so repaid to plaintiff by sale of such stock.

"4. If you find that the defendant through its board of directors, or the chairman of such board, requested the plaintiff to perform the services mentioned in evidence as having been performed by plaintiff and sued for in this case, or in any part of the same, and that plaintiff afterward with express or implied assent to such request performed services of value to defendant with defendant's knowledge, and defendant did not object thereto, but accepted such services and the benefits thereof, then the plaintiff is entitled to recover the reasonable value of whatever services were so performed, although defendant may never in express terms have agreed to pay for the same or fixed the price thereof, unless you further find from the evidence that it was understood between the parties that plaintiff was not to charge, or the defendant not to pay for such services or any of them.

"5. If you believe from the evidence that it was the usual course of business of the company for the chairman to direct the business of the company for which it was organized,

and if you further believe that the chairman requested the plaintiff to perform services in and about the company's business, and that the services were performed upon the said request, then the defendant will be bound to pay plaintiff the reasonable value for such services.

"6.  If you believe from the evidence that at any time prior to the performance of services, if you believe that services were performed, plaintiff met with defendant's board of directors at defendant's office and the defendant, through its chairman, then and there requested plaintiff to perform services in and about its business and that thereafter the plaintiff performed the services so requested, then the defendant will be bound by such request so made to pay for the reasonable value of such services whether said act of the board was recorded in the minutes of their proceedings or not.

"7.  And you are further instructed that if services were rendered by plaintiff in and about defendant's business with the knowledge of the directors and general managers, and without any dissent on their part, the defendant is bound to pay the reasonable value thereof in the absence of any express contract under which the services were performed.

"8.  The court further instructs you that although you may not find that the services of the plaintiff were requested by a person duly authorized to act for the defendant, yet if you find from the evidence that he was requested to perform such services by any person connected with the defendant and that services were performed by the plaintiff, in pursuance of said request, and that defendant availed itself of the services so performed, and received the benefits thereof, it thereby ratified such authorized act, and will not be heard to say that the original request was not made by a person legally authorized to act for the defendant.

"9.  You are further instructed that if you believe the

services were performed as defined in previous instructions, then before you can find for the defendant on the ground that such services were gratuitous, it devolves upon the defendant to prove to the satisfaction of the jury either by express agreement or from the surrounding circumstances, that said services were gratuitously performed.

"10. You are further instructed that if you find for the plaintiff on the first count of his petition, and you find any account for him for services rendered, and if you should further find for him any sum on account of money advanced, then you will add together all that you may so find in one sum, and express the same as being your verdict on the first count.

"And you are further instructed that if you find for the plaintiff in the second count, as defined in these instructions, you will assess the value of the property converted and express it as being your verdict on the second count and separate from your verdict on the first count.

"11. You are instructed that the instrument executed by plaintiff on the sixth day of February, 1895, and called a release, did not have the effect of releasing any property on the Sandyford farm that belonged to the plaintiff, and upon which Dummitt had no claim.

"12. [See 14a.]

"13. In order to constitute the plaintiff Sidway, a promoter of the defendant company, it is necessary for you to find that he alone, or with others, procured the formation of the defendant company. The mere fact that he agreed to sell the land to the company when formed, or that he gave the persons organizing and forming the company, information of the character, the climate, soil, etc., of the land proposed to be sold, or rendered such persons any services whatever, at their request, would not constitute him a promoter. He must have actively assisted in the formation of the company as by solicit-

ing others to take the shares of stock, become members of such company, etc. If plaintiff was not a promoter then he can not be charged with the difference between the price of the land paid by him and the price sold to the company.

"14. If you believe from the evidence that the defendant, through its officers or board of directors or attorney, had knowledge or information prior to the third day of March, 1891, that the plaintiff paid less than the sum of $1.50 per acre for the land which he sold to the defendant for that price then you will find for the plaintiff on the sixth count of the answer relating to the counterclaim for sale of land; and in this connection it is immaterial how much less plaintiff actually did pay for such land, or how much less defendant had information he paid.

"14a. You are instructed that before you can find for the defendant any sum on account of the obligations of the bond alleged in defendant's first counterclaim, you must find that Dummitt sold or removed live stock from said farm within the three thousand dollars limit, and failed to pay the company the value of said live stock within said limit, after deducting the value of any improvements made by said Dummitt, if any, and you must further find that the value of said stock so sold or removed was agreed upon before the commencement of this suit, between Dummitt and the company.

"15. If you believe from the evidence that the services performed by plaintiff were continuous and not to be paid for until completed, then the plaintiff's right of action did not accrue until the said services were completed, and if the last of said services were completed, and if the last item of said services was performed within five years prior to the third day of March, 1896, then the plaintiff's claim for services is not barred by lapse of time, notwithstanding that other items or parts of

such services were performed more than five years prior to such date.

"16.   You are instructed that, at the time of the second sale of land to the defendant in 1883, the plaintiff was not a promoter of the defendant and can not be charged as such.

"17.   You are instructed that, under the pleadings and evidence in this case, the defendant can not recover on the fifth count of its answer, relating to the failure of Dummitt and the plaintiff as partners, to pay for stock sold by defendant to Dummitt.

"18.   You are instructed that under the pleadings and evidence in this case the defendant can not recover on the fourth count of its answer, relating to failure of Dummitt and plaintiff, as partners, to kill brush and make pasture on defendant's farm.

"19.   You are instructed that although you may believe from the evidence that plaintiff in the course of his correspondence with the officers and shareholders of defendant, casually used expressions to them which implied that he was not receiving any compensation for his services, yet if you believe that the officers of the defendant knew that such services were not being performed gratuitously, you will, under these instructions, find on this item for the plaintiff, unless you further believe that the defendant relied and acted upon these expressions of the plaintiff to its injury.

"20.   You are instructed that although you may believe that at one time the plaintiff was performing services for defendant without compensation, yet if you believe from the evidence that plaintiff had ceased to perform such services, and defendant thereafter requested plaintiff to perform further services, and the plaintiff thereafter did perform such services requested, and it was not expressly agreed that such services should be without compensation, you will find the issues for

the plaintiff, for such services so performed after such request.

"21.　Although you may find that the plaintiff, at the request of the defendant, executed a release to the defendant on any claim he might have had on the live stock on the Sandyford farm, yet if you further believe that said release was for the purpose only of permitting the defendant to procure a first lien on said live stock for feed thereafter to be furnished, and the defendant thereafter without the consent of plaintiff, took a mortgage on the property for other liabilities than for feed, then such mortgage would not preclude the plaintiff from his claim, except as to the amount of said feed bill."

Defendant objected to each and all of the said plaintiff's instructions, but the court overruled the objections and gave all of them, and defendant excepted.

Then on behalf of defendant, the court gave *nine* instructions, covering *three* printed pages:

"A-1.　22.　Although it is ordinarily true that services performed by one person and willingly received by another, raises a presumption of an undertaking and obligation to pay the reasonable value thereof, yet if the jury believe from the evidence that the facts and circumstances attending the performance of the services in question and the relation existing between the parties is shown by the evidence to have been such as implied a mutual understanding between the parties that the services were not to be charged or paid for, then such presumption can not arise and the plaintiff can not recover.

"A-1.　23.　And in determining the facts of the case the jury must judge for itself as to the credit due any witness, taking into consideration his relation to the case, interest in the results, manner of testifying, reasonableness of his statement as compared with the common observations and experiences of life under like circumstances; and if it be found that any witness has willfully testified falsely to any fact material

in the case, the jury may disregard his testimony, or believe such parts of it as the other evidence may justify.

"B. 24. If it be found from the evidence that the plaintiff gave his services to the company or its officers or agents with no intention at the time of having the company pay therefor, or if by his conduct and statements at or before any services under consideration, he induced them to believe that such services would be given without charge, and that the services were received as being so given, then he can not recover in this action for such services; and it could not make any difference in such case how great or valuable or extended such services were or upon whose request given, or what interest plaintiff may have had as a stockholder or otherwise.

"C. 25. If it be found from the evidence that, for any of the time in question here, the conditions, circumstances and relations between the plaintiff and the company were such that by mutual general arrangement and understanding between them his services in its behalf were to be and were voluntary and free of charge, then the presumption is and must be that the same arrangement and understanding continued throughout, unless a change to a different arangement or understanding between them be proved by the evidence. And the burden of proving such change by the greater weight of the evidence rests upon the party asserting that it was made.

"D. 26. If it be found from the evidence that the plaintiff received from the secretaries of the company statements by letter purporting to be statements of fact bearing against his claims in this case and relative to the subject-matter of his services and the intention with which they were rendered and that he understood and answered, acknowledging receipt of such letter without denying or questioning the truth of such statements of fact, then the jury may infer the truth

thereof upon the ground of implied acquiescence and admission on his part.

"F. 27. The fact, as shown by the evidence here, that within the time in question, there were mutual statements of account made, rendered and settled by and between the parties from time to time relating to items and charges growing out of and connected with the subject-matter of the plaintiff's action and claim in this case, may be taken into consideration by the jury, against the plaintiff, with the other facts and circumstances in evidence, in order to determine whether he should be allowed to recover for the alleged indebtedness to him.

[28 and 29 appear further on.]

"H-2. 30. The plaintiff can not hold the company in this case for any money he may have furnished Dummitt on his account, if any, nor for money that he may have assumed to advance Dummitt in behalf of the company, if any, without authority to do so from the board of the company's directors; nor can he recover for any sum whatever that may have been loaned or advanced to Dummitt, if any, on account of the business or operations of Sandyford farm in connection with the lease and contract concerning it as entered into between Dummitt and the company.

"J. 31. Under the first counterclaim in defendant's answer the liability of the plaintiff upon the bond therein set out was not for the $6,000 penalty mentioned but only for such damages within that amount as might arise, if any, to defendant for any failure of Dummitt to comply with the conditions of the bond as therein written. And under the terms of said bond the live stock purchased by said Dummitt from the company might properly be by him disposed of by sale or removal from the Sandyford farm to the extent only of the sum of $3,000 with the addition of the amount of credits allowed, if any, for payments, and improvements of pasture lands at prices

agreed in the contract between Dummitt and the company, but Dummitt's failure to pay defendant for the proceeds or value of the cattle so disposed of by him to the extent of the excess of such sales or removals above the said credits, imposed an obligation upon Sidway to pay to the company damages to the amount of such excess within the limits of $3,000 with interest at the rate of six per cent annually from the time it became due the defendant, March 1, 1895, and upon that basis the jury will assess the defendant's damages for breach of said bond.

"L. 32. If it be found from the evidence, that Sidway, being himself a promoter of the company sold any of the lands in question under the defendant's fourth counterclaim to the company, through provisional agreement in evidence, and obtained pay therefor at $1.50 per acre, by holding out that he had contracted to pay, or had paid that as their cost price, and if it be found from the evidence that in fact the cost price to him was less than that, then he would be liable to the company for the difference between the cost price that obtained by him from the company, and defendant would be entitled to recover judgment accordingly, unless it be defeated under other instructions of the court herein."

The court then, after refusing instructions G 28 and 29 as asked by defendant, gave them as modified, the modification consisting in substituting the words in capitals for the words in italics and brackets; defendant excepting to the modifications:

"G. 28. Even if the jury should believe that the company received services from the plaintiff at different times during the years in question, in such way that it might have been liable to pay him for the same, yet if it be found from the evidence that such service was rendered at a time more than five years next before the third day of March, 1896, when this

action was first brought, then the plaintiff can not, under the limitation of law, recover for any such item of service, unless it should also be further found from the evidence that there was a [*mutual running account*] CONTINUING SERVICE between the parties as to include such items and that the same was left open until a time within the said five years for the purpose of future settlement and payment of such balance as might be found due thereon, and also further appear that the last item of such [*open and running account*] CONTINUING SERVICE accrued in fact within the said five years before the action was brought.

"29.    But if it be found from the evidence that any supposed or alleged last item of any [*running account*] CONTINUING SERVICE as is above mentioned was voluntarily added by plaintiff to give it the appearance of extension up to a time within the said last five years, or that the alleged [*account*] ACCOUNT OF SERVICE was falsely so constructed by plaintiff as to give it the appearance or seeming of an open and [*mutual account*] CONTINUAL SERVICE in good faith running between the parties, and that there was not in truth any such [*open account*] CONTINUING SÉRVICE between the parties, within the said five years, then the limitation law must prevail and the plaintiff must stand barred from recovering as to all items previous to the said five years."

Of its own motion the court then gave instruction MM. 33 :

"MM.    33. The jury will, by their verdict in this case, find the issues either for the plaintiff or for the defendant company separately on each of the several distinct causes set out in the plaintiff's petition and the defendant's answer, referring to the same briefly and substantially as follows :

"1.    On the first count of the plaintiff's petition in regard to items of service and money.

"2.    On the second count of the plaintiff's petition in

regard to the conversion of goats.

"3. On the first counterclaim of the defendant as to the damages on the bond for Dummitt.

"4. On the second counterclaim of the defendant as to improvement of pastures on farm.

"5. On the third counterclaim of the defendant as to the purchase price for the stock and property sold in the name of Dummitt.

"6. On the fourth counterclaim of the defendant as to the purchase price of the land taken from the railway company.

"And any finding of any sum of money in favor of a party must set out the total sum so found under the count or counterclaim to which the finding refers."

### DEFENDANT'S REFUSED INSTRUCTIONS.

Defendant also asked the court to give the following instructions to the jury in the case.

"A-2. 34. The defendant company can not be held liable to the plaintiff for any alleged services or benefits or advancements by plaintiff that were not authorized or accepted either by its board of directors or by some representative of the board holding power from it to employ or receive such services, benefits or advancements and by the term 'board of directors' is meant, not individual persons composing it acting singly, but the assembled members or majority thereof acting officially as such board, and the fact that the plaintiff was largely interested in the company on behalf of himself or other individual shareholders, could not justify him in assuming to bind the company as a corporation to pay him for advice or services given or received otherwise than under authority or sanction

Vol 163 mo—24

of the board or its authorized representatives having power to obtain or receive the same.

"E-2.    35.    The facts in dispute must be determined by the jury from all the evidence in the case, but mere statements in the plaintiff's letters or reports are not to be considered as any evidence of the facts in his favor therein stated; although the voluntary statements therein of facts bearing against himself are presumed to be true because made against his own interests until the contrary be proved, and the defendant has a right to have the jury consider the whole or any letter containing any admission against himself so far as it may limit, modify or destroy the supposed admission in order to give such letter its due and proper weight in the case.

"I-1.    The agreement and contract of 1894, had the effect in law of giving to the company a mortgage for the benefit of itself and Sidway on the cattle and stock of Dummitt, belonging to, connected with or upon Sandyford farm or connected with its operations or business in his hands, then or at any time thereafter.    And the release by Sidway to the company of his claims on the live stock and property of said farm owned or controlled by Dummitt under agreement with the company at the time had the effect in law of extinguishing all his right and claim to any part thereof.    And if the goats in question had been purchased with the money loaned him by the plaintiff on purpose to aid him in his operations on and in connection with the business of the said farm or belonging to Dummitt otherwise, then the plaintiff had no right to them as against the company but it had a right to them under its mortgage. And if it be found from the evidence that Sidway by his conduct and representations to the company's manager, Purdy, in and about the aforesaid contract and telegram and release, induced the manager to believe that the live stock, including the goats, belonged to Dummitt for said farm operation and under

such belief to make advances of money to pay for the feed of the live stock, and that the mortgage of February 11, 1895, was taken to secure such advances, then the plaintiff is estopped from setting up claim that the goats were not subject to the mortgage, and this is true whether the plaintiff thereafter claimed the goats before they were sold or not.

"K. 37. If it be found from the evidence that Sidway and Dummitt were interested together in the purchase of the stock and property and lease of the farm from the company and that the same were purchased taken and employed by them in the cattle-farming business for their mutual benefit, but in the name of Dummitt only, then Sidway is liable for the purchase price and also for the performance of the conditions of the lease contract, as imposed upon the name of Dummitt in all respects as if he had been named in the transaction instead of Dummitt.

"H-1. 38. The items of cash set out in the plaintiff's statements as having been paid or advanced to Dummitt, must, under his evidence as to the time, purpose and objects of such payment, be found against him and the jury will consider accordingly in making their verdict. On his claim for services he can not recover under the evidence and pleadings for annual or continuous employment, but for only such services, if any, as he rendered and the company received otherwise than as free and voluntary."

But the court refused to give any one of these five instructions and defendant excepted. These instructions thus refused covered two printed pages.

On the evidence adduced, the jury returned this verdict:

"1st. We, the jury, find the issues for the plaintiff on the first count of his petition and find him entitled to eleven thousand seven hundred and thirty dollars.

"2nd. We, the jury, find the issues for the plaintiff on the second count of his petition, and find him entitled to six

hundred and seventy-five dollars.

"3rd. We, the jury, find the issues for the defendant on his first counterclaim, and find him entitled to three thousand dollars, with interest on same, three hundred and thirty dollars and fifty cents.

"4th. We, the jury, find the issues for the plaintiff on defendant's second counterclaim.

"5th. We, the jury, find the issues for the plaintiff on the third counterclaim of defendant's petition.

"6th. We, the jury, find the issues for the plaintiff on the fourth counterclaim in defendant's petition.

"(Signed.)        JAMES W. GILSTRAP, Foreman."

On return of the verdict the court struck a balance, and entered judgment for plaintiff for $9,074.50, from which defendant has appealed. Defendant filed motion for new trial, which being denied, it saved the point. Such points in the motion as deemed necessary, will be adverted to hereafter.

First, we will discuss the action of the court in regard to plaintiff's second amended petition and in regard to denying defendant's motion to strike out that petition. This is the first time in the course of considerable practice at the bar, as well as experience on this bench, that I have ever known a motion to strike out and from the files a pleading, met with a *reply and an affidavit*. The practice seems to be confined to the county in which this cause had its origin.

In order to raise the question of the indefiniteness of a pleading, however, it is by no means necessary to file a motion to make it more definite and certain; and this is so for two reasons: First, the statute (section 612, Revised Statutes 1899) devolves the duty on *the court* of requiring the pleading to be made more definite and certain. Second, the adverse party may, indeed, move to have the pleading made more definite and certain, but is not compellable to do so; the *primary duty*

to make the pleading clear and unequivocal is on the party who drafts it; he it is, who without motion or suggestion from his adversary, on whom rests the *onus* of making the pleading definite and certain, which burden can not be cast on the adversary, by the fault of the pleader failing to perform his own duty. And notwithstanding our statute (section 629), requires pleadings to be *liberally* construed, etc., this only extends to the *form* of the pleadings, and does not apply to the fundamental requirements of a good pleading, and the pleader is not allowed now, any more than formerly, by inserting doubtful or uncertain allegations in a pleading, to throw upon his adversary the hazard of correctly interpreting its meaning. [Clark v. Dillon, 97 N. Y. 370; Young v. Schofield, 132 Mo. loc. cit. 661, 662; Boles v. Bennington, 136 Mo. loc. cit. 529; Snyder v. Free, 114 Mo. 360.]

Our statute (section 592, Revised Statutes 1889) provides that the petition shall contain "a plain and concise statement of the facts constituting a cause of action." By section 3852, Revised Statutes 1899, of the statute relating to justice's courts, the requirement is that the plaintiff shall file "a statement of the facts constituting the cause of action." So that the only appreciable difference between the statements required in either of the courts, is that in the circuit courts the statement must be *"plain and concise."* Even in justice's courts, however, this court has held, that where the statement does not set forth "the facts constituting the cause of action," that there it does not "advise the opposite party what he is sued for," and in such case the suit should be dismissed. [Brashears v. Strock, 46 Mo. 221; Davis v. Railroad, 65 Mo. 441; Swartz v. Nicholson, 65 Mo. 508; Butts v. Phelps, 79 Mo. 302; Casey v. Clark, 2 Mo. 11.]

In this court it has been ruled that where, as in this instance, the trial court on motion made, required a petition to

be made more definite and certain, and the order was disobeyed, this justified the lower court in dismissing the petition; remarking that the statement of the cause of action was so indefinite and uncertain that *"the precise nature of the charges"* upon which the plaintiff sought to recover was not apparent. [McAdam v. Scudder, 127 Mo. 345. See also, Watkins v. Donnelly, 88 Mo. 322.]

So that it is apparent from the statute, that not only must the petition, in order to pass muster, contain "a plain and concise statement of the facts constituting a cause of action" (section 592, supra), but *"the precise nature of the charge"* must be apparent (section 512, supra). And the petition here abounds in statements of legal conclusions, thus: "That said service consisted in managing and assisting in managing and conducting the business of defendant in America, and in buying and selling lands for defendant and collecting the purchase money therefor, in keeping and overseeing the books and accounts of defendant, in managing and overseeing the farms of defendant and the live stock, and in buying and selling live stock, and in counseling, aiding and advising......the defendant in the management of its business generally in America, and to that end making numerous trips from Chicago to Newton county, Missouri, and other places and one trip to Edinburg, Scotland, all at the cost and expenditure of a large amount of time and money."

And it has been frequently ruled in a State from whence our code is derived, that such statement of a *legal conclusion* is not the averment of *an issuable fact, and therefore is not confessed to be true by a demurrer; raises no issue and need not be denied.* [Kittinger v. Traction Co., 54 N. E. Rep. loc. cit. 1084, 1087, citing 12 Ency. Pl. and Prac., 1022. See, also, McKenzie v. Mathews, 59 Mo. loc. cit. 102; Verdin v. St. Louis, 131 Mo. loc. cit. 150, 151; Craft v. Thompson, 51 N.

H. loc. cit. 540; Bliss Code Plead. (3 Ed.), sec. 413, and note, and secs. 210, 212.]

The theory of our code is that the *facts* in a pleading are *constitutive*, and in order to be proved must be alleged. [Pier v. Heinrichoffen, 52 Mo. 333.] Every substantial fact which the plaintiff in order to recover, must prove, he must also allege so that an issue can be made thereon. [Lanitz v. King, 93 Mo. 513.]

"The practice act was to make all pleadings special, to abolish general averments stating conclusions of law, in a declaration or answer. It was meant that the pleadings should be a statement of the facts of the case on both sides, not of the evidence, but of the facts to which the law is applicable. Gamage v. Bushell, 1 Mo. App. 418. The allegation controverted must be the statement of a fact; hence, in making an issue he has nothing to do with legal conclusions." [Bliss Pl., 334. PHILIPS, Comr., in Kerr v. Simmons, 82 Mo. loc. cit. 275.]

For these reasons, the action of the lower court in refusing to enforce its original order, must therefore be held erroneous, and ground for reversal. And while on the subject of pleadings, as this cause must be retried, it is well enough to say that defendant's answer would *justify a very large "diminution of the record."* The whole of defendant's answer can be abundantly and redundantly stated in the compass of two printed pages. This should be looked to before another trial.

Relative to defendant's *"rejoinder,"* it is difficult to conceive the necessity or excuse for its existence, seeing that the statute of 1899 (section 628) provides that "the allegations of new matter in the reply shall be deemed controverted by the adverse party, as upon a direct denial or avoidance;" and seeing that, also, section 596 provided that "the only pleading on the part of the defendant is either a demurrer or an answer;" and seeing that section 607 provides for a demurrer to a reply, and

that section 609 provides that "when a replication shall be filed, the cause shall be deemed at issue." But even if there were no such statutory provisions, still, why should defendant, on any recognized rule of pleading, *deny plaintiff's denials of defendant's counterclaims?*

Next for consideration are the instructions, respecting which we say that *nine and one-half* printed pages of instructions, is too much for an average jury to digest and understand. The only effect of such a multiplicity of instructions would be not to *instruct* the jury, but to *confuse* and *mislead* them; make their verdict mere *guesswork*. The changes rung on all the phases of this case, and some not of this case, by this vast array of instructions, reminds one of what Judge SCOTT used to say was *"like the multiplication table set to music."* We have remonstrated with the trial courts for years about the great impropriety and frequent injustice resulting from writing or giving instructions *by the acre,* but without avail, and so resort must be had to more drastic measures. We therefore hold that the great number of instructions given in this instance, *of itself,* warrants a reversal of the judgment.

And without going into a detailed discussion of this "mountainous mass of inert matter" which these numerous instructions furnish, it is not improper to examine some of them and point out their exuberant errors.

As to whether the alleged services of plaintiff were wholly gratuitous as averred in the answer, a few excerpts from his correspondence with the secretary and different members of the board of directors are here given.

To Fraser, December 10, 1885: "Although not connected with the management of the company, I believe I am its largest shareholder, and will undertake to represent the views of all American shareholders."

To the shareholders, December 14, 1885: "Before any

action is taken in so important a matter, I, as the largest share-holder, and familiar with the property, though not in any way connected with the management in Scotland or America, desire to present for your consideration some facts. . . . . My only interest in these matters is that of a shareholder. . . . . "

To Fraser, October 6, 1886: "Within the past few months I have increased my interests in the locality of the company's property in a way that will require my personal attention more than formerly. I can, therefore, in future, render the board much assistance which formerly would have been impractical, and I trust the directors will not hesitate to call on me for any service in my power to give them."

To Fraser, June 15, 1887: "You probably recollect my advising that *Captain Purdy be retained as Mr. Pollok's general adviser,* and I may say, that highly as I esteem Mr. Pollok, I would not have approved making him manager had I not supposed he would have had an experienced general adviser."

To Fraser, August 23, 1887: "In suggesting that Mr. Pollok have in Captain Purdy an adviser, my intention was to furnish intelligent advice in an agreeable way, on all matters of business with which he was not familiar, not a man to go to in special cases. No such thing as divided authority was for a moment thought of, nor did I think of giving Captain Purdy any authority whatever, but did rely on Mr. Pollok's good sense and fidelity for acting as he thought for the company's interest, after receiving the information which Captain Purdy could give him."

To Littlejohn, September 16, 1886: " . . . . and if you think best you may say that in the reorganizing and disposing of the cattle you will have my co-operation and advice, for I am perfectly willing to be responsible with the directors on reorganization and care of the farm until sold or leased, if Lawson does not take it . . . . There is another thing I have

thought of and which I have no delicacy in speaking of to you, feeling that by this time you know me well enough to be certain that I neither want control wholly or in part, and that I am loyal to the board, individually and as a board. My idea is that, if thought best, it might be announced in your own way, that in view of my holdings, location and experience, the board had decided to associate me as adviser, or in whatever way and to what extent you may see fit."

To Fraser, October 20, 1887: *"The trip to Neosho was made at my own option and expense,* and I desire this communication to be personal between the board and myself."

To Tate, October 29, 1887: "You must bear in mind that I know but little more of Pollok's business than you. I had no authority or even suggestion to overlook the office and when I did go too far was brought up by the home office."

To Martin, November 3, 1887: "I handle none of the money or have no advantage in any way except as a shareholder."

To Martin, November 24, 1887: "It is not a question of whether my efforts are appreciated, which is a small matter, but is a question of self-interest and a duty owed to persons who have relied upon my ability and good faith."

To Fraser, November 25, 1887: *"I get no pay from the company for any service,* never have any of its money on hand, never had a man work for the company in whom I was interested."

To Martin, December 5, 1887: "I also desire to avoid being known to the shareholders or public as having anything more to do with the management, than can be avoided. It is enough for me to have a company that I originated, a success, and I regard it important for the good of the company that they believe the directors take the best means for getting information."

To Martin, January 9, 1888: "I am best served by the success of the company, and my efforts have all been made to help the board."

To Readman, September 24, 1888: "I advise the new company just as I did the old one and also give it my time *free of charge* and now the board must assume the responsibility."

To Fraser, February 11, 1889: "You are aware that although much of my time is now, and for the past two years has been, given to the company's interests, *I draw no compensation from its funds for either myself* . . . . and that my only interest in the company is in the value of its property. . . . . I have not now nor never have had any personal feeling in the matter, but have always taken great pains in explaining the business and answering your questions, and while I regret being compelled to write as I have, it is simply a matter of dollars and cents, of protecting my property, in which I am acting within my own personal knowledge and experience, for my own good and the good of associates whose interests are identical with my own."

To Swan, February 22, 1889: "The farm gives me a great amount of trouble and takes lots of time *for which I get nothing.*"

To Martin, February 9, 1888: "I am the largest shareholder, am on the ground, and familiar with every department of the business. Have no relatives or persons dependent on me employed by the company, do not handle their money or have any profit out of the business, *and work without pay.* . . . . It is quite enough for me to have the company do well."

To Fraser, February 18, 1889: "You are aware that, although much of my time is now, and for the past two years has been, given to the company's interests, I draw no compensation from its funds for either myself, any member of my family, or any one in any way dependent upon me; and that

my only interest in the company is in the value of its property."

These extracts are of a very conclusive nature against the existence of any valid claim of plaintiff for services or management or advice or money advanced or expended for defendant. And there is much testimony on the part of witnesses conducing to the same result as that produced by plaintiff's own written and repeated admissions.

Readman, a director in defendant company, testifies: "Mr. Sidway spoke as if he had had a good deal of trouble personally in connection with the management. He said nothing about being paid but he said on the contrary that *he was giving his time for nothing, that he was making no charge for his time.* I looked through the papers I have to see if I could find any letters in which he made reference to the matter of charging and I could find only one letter addressed to me when I was in the United States in which he referred to the trouble he had taken and said that he was charging nothing for his time. That letter is about a number of other matters but he mentions that. I produce that letter dated twenty-fourth September, . . . . Referring to the letter of twenty-fourth September, 1888, and passage therein: 'I advised the new company just as I did the old one and also gave it my time free of charge.' It is the fact that he gave the new company his time free of charge. I do not think it is the old company he is referring to."

Mr. Skirving, a director since 1887, testifies as follows: "I know that Mr. Sidway has been often communicated with, regarding the affairs of this company, and that his advice was asked. Mr. Sidway was consulted with because he was the vendor of the whole land and very much interested in it and I fancy he got a good profit. I always understood he was the largest shareholder in the company and therefore he very naturally took a great interest in the matter. I did not understand that he was a paid official of the company or that he was

to be paid a fee for his advice.   I understood that he made claims from time to time for some petty cash expenditures he had made and was paid all these claims.   He never, that I heard of, made any claim for a fee for advice or trouble.   I was quite astonished when he made such a claim in 1895, immediately before this action was raised."

Mr. Purdy, the present managing agent here, says:   "Several times, in fact very often, I have met Mr. Sidway in Chicago and have sometimes in St. Louis, and I have consulted him as I would any other large stockholder of the company. He was here and had large interests in the company, and at one time I think the company authorized me in a deal they had on some property in Chicago, to go and see Mr. Sidway and consult with him.

"Q.   Now I will get you to state what control, if any, Mr. Sidway exercised over you, after you came into the management, beyond simply consulting and advising?   A.   Nothing only being a member of the company and a large stockholder, and the only one on this side of the water that had any interest in it, and I very naturally consulted with him when I wanted any advice.   I don't think I got any instructions from the company, though, to that effect.

"Q.   What service did you employ Mr. Sidway to do in behalf of the company, if any?   A.   I don't know of any, only just simply consulting with him.....

"After I went there after Pollock left, I think sometime in 1887, I was appointed manager, but was under instructions from the other side until I think some time in the spring of 1888, when they gave me full power to manage the business; before that, any move I made I consulted them over there, and got instructions from headquarters, in Scotland.

"Q.   And that is what you mean by getting full control?

A.   Yes, sir.   I did not get full control, I think, until in the spring of 1888."

Mr. Lawson, the first manager, says:

"Q.   I will ask if you were not asked this question in your deposition in Saint Louis, with reference to Mr. Sidway and his actions:   'Now what did he do, if anything, in the way of managing or controlling the business of the company at Neosho?'—and did you not answer to that, in response to that, say that he 'did not do anything towards or controlling or managing; the authority was invested entirely in me?'   A.   That is correct, whether I said it or not.   But the Neosho end of the business was only one end of the thing.   There was a financial end to it.   They had to work at that, which was quite as important to the shareholders as this end here.

"Q.   His relation so far as you know, was the same as any other shareholder?   A.   Yes, sir, so far as I know.   As far as I was personally concerned.   If he had been a director we would have paid him.   At least the other fellows got paid. . . . .

"Q.   The system pursued here by the company in its business was to have a central office at Neosho, with a resident manager?   A.   Yes, sir.

"Q.   At the head of the operations generally?   A.   Yes, sir.   As I was the manager I was responsible for all other operations here—buying and selling lands.

"Q.   The sales of land was through agents residing in the various counties where the company had lands for sale?   A.   Yes, sir.

"Q.   And these agents reported at the office at Neosho?   A.   Yes, sir.

"Q.   They were paid commissions and collections?   A.   Yes, sir.

"Q.   And not salaried at all?   A.   No, sir.

"Q.   Mr. Sidway has talked to you early in the course

of the business of the company before you began your operations about giving his services to the company gratuitously, has he not? A. In the start, I presume it is so. I know he promised me his services and I did not imagine he would charge me anything for it at the start. I was new to that sort of business here and I had to be coached."

Bryce, a clerk at the Neosho office, testifying, gives the details of the business management.

"A. The manager in the Neosho office had complete control of the business of the company in this country.

"Q. Who was the manager when you first came? A. Andrew Pollok. Pollok was manager, and then Purdy followed him, and Tweedie and McEwen and myself were the employees in the office apart from servants, and Mrs. Tweedie acted as housekeeper for us, I believe, and on the ranch a man named Dummitt was foreman. There were some cowboys employed on the ranch, and some men employed to clean it.

"Q. They were under whose supervision? A. Dummitt was the foreman of the ranch, and he had the hiring and discharging of them unless he was interfered with by the manager of the company.

"Q. The receipts and disbursements pertaining to the business of the cattle ranch; how were they managed? Describe any difference if there was any? A. There was none. The money all came through the Neosho office.

"Q. Who kept the accounts pertaining to the cattle-ranch business? A. I kept the accounts in the office.

"Q. From whom did Dummitt receive compensation for his services? A. From the office. By payments from the office.

"Q. I will get you to state what, if anything, Mr. Sidway had to do with either serving or managing this company,

within your knowledge, or its business, if you know? A. Nothing.

"Q. What was his business? What was the attraction for him there if you know, from your observation, and from what you heard him say? A. Mr. Sidway stated to me once that he came there simply to keep a sort of eye on the ranch, as it was an experiment in which he was interested, that he had nothing to do with the management of the ranch or company.

"Q. Now what, if anything, did Sidway tell you, on that day or subsequently, in regard to the condition of the business and his connection with it? A. He stated, as I said, he had no idea of the condition of affairs existing in the office, as to the forwarding the reports, and stated it was something that he had nothing to do with, he had nothing to do with the management of the company, and had not anything to do with it."

Mr. Tweedie, another active clerk, says:

"Q. Who shared the responsibility and the duties of management with Mr. Pollok, if anyone, in your knowledge? A. I don't know of anyone.

"Q. I will get you to state what, if anything, Mr. Sidway had to do with the management or service of the company during the time of your service, if anything, if in your knowledge? A. I do not think he had anything to do with the management of the company excepting to come down there as a stockholder of the company, but I do not think he was in the management. I did not understand it so.

"Q. What did he do when he came? A. He came down there and went out to the ranch, I think.

"Q. What had you to do with the keeping of the books pertaining to the ranch? A. I had nothing to do at all.

"Q. Who did? A. Bryce used to keep the ranch books.

"Q. What part of the books did you keep? A. I kept

the landsales account.

"Q. What had Mr. Sidway to do, if anything, with the landsales or the collection of moneys on account of land purchased? A. Nothing.

"Q. During the time Mr. Pollok was there, what did you know with regard to the length of time Mr. Sidway would spend in Neosho, or upon the ranch, upon the occasions of his visits? A. He usually came in the morning and went away on the evening train."

Aside from these letters of plaintiff, disclaiming all thought or intention of charging anything for his services, the books of a firm in which he was partner, engaged in selling land, etc., no such charge is made, nor did plaintiff, until suit was about to be brought on the bond, ever lay claim for services rendered the company.

And the very fact that during the lapse of so many years he made no charge and presented no account for his services, is pregnant evidence that no such charge was in contemplation on his part or anticipated by defendant company. [Aull Sav. Bk. v. Aull's Admr., 80 Mo. 199; Watkins v. Donnelly, 88 Mo. 322, and subsequent cases.]

If there was no substantial evidence, as it seems there was not, to overcome the frequently written admissions of plaintiff that his services were gratuitous, then there was no basis laid for an instruction given at the instance of plaintiff to the effect that the burden was on defendant to show "that said services were gratuitously performed." It is everywhere conceded that no one can make another his debtor without the latter's consent. "But, ordinarily, if one stands by in silence and sees labor performed on premises belonging to him, of which he accepts and enjoys the benefits, a promise to pay therefor may be inferred."

Vol 163 mo—25

[8 Wait's Act. and Def., 719, cit. cas.; Sprague v. Sea, 152 Mo. 1. c. 332.]

In this case, however, no such assumpsit can be raised or implied in the very teeth of continued written assertions of plaintiff that his services were *free* and that he was *getting no pay*.

And in this immediate connection it is opportune to observe, that section 19 of plaintiff's instructions contains this remarkable language: "You are instructed that although you may believe from the evidence that plaintiff in the course of his correspondence with the officers and shareholders of defendant casually used expressions to them which implied that he was not receiving any compensation for his services," etc. This instruction was assuredly misleading, and it would seem intentionally so, because no such statements, as above employed by plaintiff could be deemed by any rational human being, *"casually used expressions."*

Error also occurred in permitting plaintiff, testifying in his own behalf, to testify as to what he *did* with Pollok then manager of defendant company, Pollok having since died. Of course plaintiff testifying as to his own actions, necessarily testified as to Pollok's actions, as defendant company's manager. The court in so ruling, made a distinction between the *words* of plaintiff to Pollok, and his *acts* towards Pollok; excluding the former, but admitting the latter. Evidence of *acts* as well as *words* are equally barred. [Goddard v. Williamson's Admr., 72 Mo. loc. cit. 133.]

Pollok was the manager and contracting agent of defendant, and he being dead, all *transactions* between him and plaintiff, whether consisting in *words* or *acts,* are prohibited from being testified to by plaintiff when testifying in his own behalf. In a word, the exclusion of testimony respecting such transactions is as broad in its character and comprehensive in its scope

as the transactions themselves. [Wendover v. Baker, 121 Mo. loc. cit. 297, and cas. cit.]

But we forbear discussing the numerous other errors, whether alleged or actual, as pointed out or existing in this record. We do this in the hope that under more favorable auspices when the pleadings and instructions are properly drawn and drafted, that the fundamental principles of the law will be more aptly and accurately applied than they have been in the present instance.

To this end, and in this hope, the judgment is reversed and the cause remanded.

All concur.