CLARENCE R. MORRIS v. THE EQUITABLE ASSURANCE SOCIETY OF THE UNITED STATES, a Corporation, Appellant.—102 S. W. (2d) 569.

Division Two, March 11, 1937.

*Barbour, McDavid & Barbour* and *F. W. Barrett* for appellant.

*Wear & Benton* and *Haymes & Dickey* for respondent.

COOLEY, C.—This case has recently been reassigned to the writer. It is a suit on an insurance policy. Verdict and judgment for plaintiff, respondent, for $10,503.33 plus $1000 attorney fees assessed for vexatious refusal to pay, and defendant appealed. The policy insured the life of James C. Morris, naming his brother Clarence, respondent herein, as beneficiary. It provided for payment of $10,000 upon the death of the insured and for $20,000 (double indemnity) "in event of death from accident." Due proof of death was made. Appellant paid the single indemnity, $10,000, but refused to pay more, claiming that the death was not from accident, within the terms of the policy. This suit was to recover the additional $10,000 and interest with penalty and attorney fees for alleged vexatious refusal to pay.

The policy provided for the payment of $20,000 "in event of death from accident" upon proof that the death of insured "resulted solely

from bodily injuries caused directly, exclusively and independently of all other causes by external, violent and purely accidental means, subject to the terms and conditions contained on the third page hereof.'' On said third page is this provision (quoting all of the pertinent portion):

## FROM ACCIDENT

''The increased amount of insurance as stipulated on the face hereof, in case of accidental death shall be payable upon receipt of the proof that the death of the insured occurred while this policy was in full force and effect, and resulted solely from bodily injuries, caused directly, exclusively and independently of all other causes by external, violent and purely accidental means, provided that death shall ensue within 90 days from the date of such injuries and shall not be the result of or be caused directly or indirectly by self-destruction, sane or insane, disease or illness of any kind, physical or mental infirmity. . . .''

The policy also provided for payment of monthly benefits in case the insured should become totally disabled ''by bodily injury or disease,'' the disability being deemed total ''when it is of such extent that the insured is prevented thereby from engaging in any occupation or performing any work for compensation of financial value.'' The insured, at the time of his death, was receiving such benefits from the insurer.

The insured was run over and killed by a westbound train, on March 11, 1932, at a railroad crossing about a mile west of Rogersville. He either fell or threw himself across the south rail of the track and his body was cut in two about at the diaphragm. Death must have been practically instantaneous. Life was extinct when the severed portions of his body were observed immediately after he was run over. The lower portion of the body was outside the rail, the head and torso between the rails. The railroad there runs approximately east and west and crosses at grade, at about right angles, a north and south dirt road. North of and adjacent to the railroad insured and respondent had a farm on which, at the time in question, they had some cows which were calving and had to be fed and looked after, which work insured did or supervised. On the morning of said March 11th, he drove to the farm, having several sacks of feed on the front bumper of his car, weighing about one hundred pounds each. He was met at the farm by a farm hand, Frank Hedgepeth, but, having arrived first, insured himself unloaded the feed and put it in the feed troughs. He told Hedgepeth they would have to come back to care for some of the cows, and both left to look after some cattle elsewhere. Insured returned to Rogersville but later that morning started back to the farm, telling a witness that he was going to look after some

cattle. He approached the railroad track from the south and, as was his custom, parked his car south of the track, because on that side there was room in the road to turn around and there was not such room north of the track. Insured then walked northward, apparently intending to cross the railroad track. It may be stated in this connection that there is some evidence from plaintiff's side from which it could be found that there were certain obstructions which might and probably would prevent a person thus approaching the railroad track from seeing a train coming from the east until he was quite close to the track. The train that struck the insured came from the east.

The only eyewitness to the accident was W. E. Criger, who was called by plaintiff as a witness. He testified in substance as follows: He was some seventy-five yards west of the crossing walking eastward on the railroad track. He heard a whistle—at just what point that whistle was sounded or whether or not it was the usual crossing whistle is not clear—and "later" saw the smoke of the engine. He then got off the track on the north side. He saw the insured walking north in the road toward the track—saw him walk thus some six to ten steps. There was nothing in his actions to indicate that he was trying to beat the train across. "He was walking the same as anybody that was going across unaware of anything." It was a cold day and the wind was blowing "pretty hard" from the northwest. Insured had his hat pulled down over his face, his hands in his pockets and his coat collar pulled up, "like anyone would that wanted to shut out the cold." Witness here illustrated how insured approached the track and threw up his right arm just about as he fell in front of the engine. His demonstration is not described in the record so as to enable us to detail it. Witness said insured did not look in the direction from which the train was coming until "he threw up his arm this way" and that the motion of his arm and the look and fall were "altogether." "Q. (On cross-examination.) He did stop? A. He checked, yes. Q. What do you mean by checked? A. I mean the stopping and throwing up the hands was all done so close together you couldn't tell the difference." At another time he said it was all done in a moment's time. Asked if insured "fell toward the train or away from the train" witness said, "He fell on an angle from the train. . . . The train was coming from the east and he fell angling from the train, northwest you might say, away from the train." "Q. How did he fall? Did he fall crumpled down or just fall lengthwise? A. Just when he made that motion there it seems he went this way and fell like this (indicating). Q. Fell forward? A. Yes, sir. Q. The train was coming from his right? A. Yes, sir, coming from his right and he fell more to his left."

From Criger's testimony it appears that he was not certain whether the engine hit insured as he was falling and before his body hit the rail or instantly thereafter. Whichever it was it is clear that the engine was very close to insured—practically upon him—when he fell.

The defense was that deceased's death was not "accidental" within the terms .of the policy. Defendant sought to show, partly by cross-examination of plaintiff's witnesses and partly by witnesses called by it, that insured's death may have been or was caused by deceased's falling on the railroad track because of physical infirmity or purposely with suicidal intent. On this question plaintiff's evidence tended to show that: Insured was about fifty-five years of age, a small man weighing about 125 pounds. In 1924 he had suffered from a nervous and "run-down" condition, a sort of "nervous breakdown," for which he had received hospital treatment and on account of which he had drawn disability benefits. His brother, respondent, testified that insured had recovered from that trouble prior to October, 1924. There was, other testimony to the same effect. About October, 1931, insured had another similar attack. Relative to that and to insured's subsequent condition his brother and business partner, respondent, testified: "I saw him a great deal, saw him every day and several times a day. He lived with his mother. . . . Several mornings I helped my brother downstairs . . . probably thirty days previous to his death I had been helping him downstairs. He was weak. He had some knee weakness when he would first get up. He was weak in the knees when he would first get out of bed in the morning. I never saw him fall on account of that weakness. He would act just as anyone would act that wasn't normal—what a man would be that was sick or weak. I have seen him take hold of different things to steady himself when he would first get up, and then he would walk around just as good as anybody during the whole day. When he would go in the store (a partnership store) and punch up the fire, I have seen him catch hold of the desk or something to steady himself. It was weakness on the part of himself. I do not know that he would have fallen had he not gotten a hold of something. It had been possibly thirty days before his death that I had helped him downstairs." Witness further said that insured "had made marked improvement in the last thirty days" prior to his death.

Lawrence Rush, for plaintiff, testified: "I remember when Mr. Morris was killed. I had seen him almost every Sunday for the past thirty days prior to his death. He got around all right. He was with me out at the farm. . . . He did not show any evidence of dizziness in the least. He had driven with me to my pasture quite frequently." On cross-examination witness said: "I was with him almost. every Sunday for a long time prior to his death. . . . He could get around

just as well as he ever did. I did not see anything different about him. . . . He got around just as well prior to his death as usual. I don't expect that he was as strong as he had been during his life. As far as I know he had no trouble walking at all." There was other testimony to the effect that for at least thirty days or more prior to his death insured walked and went about his usual business (though not doing heavy manual labor) without noticeable indications of weakness or any abnormality.

Defendant sought by cross-examination of plaintiff's witnesses to show that insured was subject to spells of dizziness, which attempt failed. There was no evidence on behalf of plaintiff that insured suffered from such condition. Defendant also attempted to prove by its own witness, Dr. Hale, with whom insured had talked once a few weeks before his death, that insured had complained of dizziness. Dr. Hale did not so testify. He said that insured had asked him something about the symptoms of prostatic infection and if such trouble would produce dizzy spells, but not that insured said he had dizzy spells. Defendant also called Dr. Fullbright, insured's regular physician who had treated him prior to his death, to prove his weakened and nervous condition. Dr. Fullbright testified that insured was nervous and in a "run-down" condition, largely, he thought, from lack of exercise—"after I made him take exercise he gained strength" —"he showed evidence of improvement and was stronger." He also said that insured came to his upstairs office alone and so far as he knew had no trouble going up or down the stairs; that he knew nothing of insured having ever fallen. Generally it may be said that defendant's evidence on the subject of insured's alleged physical infirmity was no stronger in its favor than the testimony of respondent above set out, if as strong. But since defendant's demurrer must be ruled by the evidence favorable to respondent we need not further detail defendant's evidence on this question.

There was no evidence in the case tending to show that insured had ever entertained the thought of suicide, or that he had any mental infirmity.

We have thus detailed the evidence because of defendant's insistence that its demurrer to the evidence should have been sustained. We quote the tendered demurrer to show the grounds on which it was based, and the theory on which the case was tried below:

"Comes now the defendant at the close of all the evidence in the case, and demurs thereto, for the reason that the evidence wholly fails to show that the death of the insured herein was caused by accident, but the evidence does show that his death was caused either by self-destruction, or caused by reason of some bodily or mental infirmity."

I. We think it clear that defendant's demurrer to the evidence was properly overruled. On the issue of suicide, as we have stated, there was no evidence tending to show that deceased ever entertained the idea of self-destruction. No presumption can be indulged that insured committed suicide. The court instructed the jury, at defendant's request, that if it found that insured intentionally threw himself in front of the train, intending thereby to take his own life, the verdict must be for the defendant. Defendant could reasonably ask no more. The jury found that issue against it. Under the evidence it can by no means be said that, as matter of law, the insured was conclusively shown to have committed suicide.

The same is true of the contention that insured fell on the track because of bodily or mental infirmity. As we have said there was no evidence of mental infirmity. There was evidence that insured had suffered from nervousness and from weakness in the knees and legs, but plaintiff's evidence was to the effect that he had substantially recovered from that weakness and that at the time of his death and for a month or so prior thereto he was able to and did walk and get around without difficulty and was able to and did attend to his usual business duties. The testimony of Dr. Fullbright, defendant's witness, lends some corroboration to that evidence. The evidence went no farther than to show or tend to show that, prior to his death insured had been nervous and had been weak in the knees and legs, and that a month or so before his death his brother had found it necessary, *when insured would first get up in the morning*—but only then—to assist him. But it cannot be conclusively presumed that even that condition continued to the time of his death, in view of the further evidence that in the last thirty days his condition in that respect had much improved and he was able to get about with no indication of abnormality. The issue as to physical infirmities, as well as that of suicide, was submitted to the jury on instructions requested by defendant and favorable enough to it, and was decided against it.

Insured may have been guilty of contributory negligence, as between him or his representatives and the railroad company, in approaching and attempting to cross the track as he did. We do not regard that question as controlling or important, under the provisions of the policy here involved.

Insured, when he fell, did not "crumple down" as though from weakness or a giving away of his knees or legs. He fell forward and rather away from the approaching engine, as though he instinctively —perhaps frantically and confusedly—attempted to throw himself away from an unexpected and suddenly discovered danger. He was almost at the rail of the railroad track and doubtless in the path of the engine, then practically upon him. He had no time in which to consider or deliberate. If, in such circumstances and for such reason,

he fell and was killed and such fall and his resulting death were not due, directly or indirectly, to disease or to his alleged physical infirmity (we have said there was no mental infirmity shown), then we think the fall and the subsequent—and inevitable—death, were accidental within the terms of the policy. The cause of insured's fall and resulting death was a question for the jury, under the evidence.

II. Appellant charges error in plaintiff's Instruction No. 1, submitting the issue of accidental death, because it "ignores the specific allegations alleged in the petition; is much broader than the issues made by the pleading; is not within the scope of the evidence, and gives the jury a roving commission to decide for themselves which of the numerous occurrences was the accident that caused the insured's death."

The assailed instruction requires the finding of facts such as the issuance of the policy, that it was in force, the death of the insured, etc.,—facts either expressly admitted by the pleadings or not in dispute—"that the death of the said James C. Morris resulted solely from bodily injuries caused directly, exclusively and independently of all other causes by external, violent and purely accidental means, and was not the result of or caused directly or indirectly by self-destruction, disease or illness of any kind or physical or mental infirmities."

On this subject the petition alleges: "That the death of said James C. Morris was of an accidental nature within the terms and conditions of said policy of insurance in that said death resulted solely from bodily injuries caused directly, exclusively and independently of all other causes by external, violent and purely accidental means, in this, to-wit: That the said James C. Morris while crossing the railway tracks of the St. Louis-San Francisco Railroad . . . and while oblivious to the approach of a certain railway train approaching the point of such attempted crossing was then and there struck and killed by the engine of said train, and that from the injuries so caused the said James C. Morris died immediately; that the injury so causing the death of said James C. Morris was not the result of, nor was the same caused directly or indirectly by an attempt at self-destruction, disease or illness of any kind, nor while the said insured was violating any law or engaged in any pursuit excepted in the indemnity clause of said policy." The sufficiency of the petition was not questioned below.

The answer admits the issuance of the policy, that it was in force, the death of insured, that proofs of death were duly made, and defendant's refusal to pay the double indemnity; denies that such refusal was vexatious, denies that insured's death was "of an accidental nature, as the term 'accident' is defined in the policy sued on, and it denies that such death resulted solely from bodily injuries caused di-

rectly, exclusively and independently of all other causes by external, violent and purely accidental means." The answer then sets out the provisions of the policy relative to double indemnity and states: "And the plaintiff (defendant?) further answering denies that the death of the said James C. Morris was accidental as the term 'accidental' is defined in the policy as hereinabove set forth, and that *by reason of such fact* the plaintiff is not entitled to recover herein." (Italics ours.)

Appellant in its brief does not point out what "specific allegations" of the petition were ignored in the instructions nor what were the "numerous occurrences" among which, as the accident that caused insured's death, the jury was given a roving commission to choose. There was but one contested issue in this case, viz., whether, as plaintiff contended, insured's fall upon the railroad track, resulting immediately in his death, was accidental within the terms of the insurance policy or whether, as defendant contended, such fall and consequent death happened either because of bodily infirmity or by suicidal intent on the part of the insured. The case was tried below by both parties upon that issue and upon that theory. Note, as fortifying this statement, defendant's above-quoted demurrer offered at the close of the evidence. The time and place of insured's death and that he died from bodily injuries caused by external and violent means were undisputed and indisputable facts. They were, indeed, conceded facts. If, in its assignment as to "specific allegations" in the petition appellant refers to the allegation that insured was oblivious of the approach of the train, we do not believe that such allegation was an essential part of plaintiff's statement of a cause of action in this case or a fact necessary to be found by the jury. This is not a suit for damages against the railroad company where negligence or contributory negligence might be an ingredient of the cause of action or the defense.

On the only contested issue the jury was instructed, at the request of defendant, that if it found that insured's death was from an accidental cause, yet that if such cause was "produced or contributed to, directly or indirectly, by physical or mental infirmity, from which the said Morris was then and had been suffering, your verdict will be for the defendant;" that unless the jury found from the greater weight of the evidence that the death was "by accident" the verdict should be for defendant; that if the jury could not determine whether insured fell in front of the train "by reason of an accident or by reason of some physical or mental infirmity, as elsewhere defined" the verdict must be for defendant; that if insured, at the time of and immediately preceding his death, was afflicted with any physical or mental infirmity which caused or contributed to his falling in front of the train the verdict should be for the defendant. This

last instruction defined "physical or mental infirmity" favorably to defendant and as requested by it. At defendant's request, the court further instructed the jury that if insured intentionally threw himself in front of the train, intending to take his life, the verdict should be for the defendant. Another instruction, given for defendant, defined "accident" and "accidental means," as used in the instructions, to mean "an event happening by chance, unexpectedly taking place; not according to the usual course of things or not as expected, as opposed to design or intention."

The instructions given on behalf of defendant are not in conflict with plaintiff's instruction. They supply and elucidate whatever may be thought to be the possibly somewhat too general statements in plaintiff's said instruction. Read together, as they should be, the instructions as a whole clearly and with fairness to defendant presented to the jury the only contested issue in the case. The jury could not have been misled or have misunderstood the only issue of fact it was called upon to decide. It is not reversible error for the court, in its instructions, to assume or to fail to require the jury to find facts which are admitted or which, from the course of the trial and the conduct of the parties, it is clearly and indisputably apparent both parties treated as admitted facts in the case. For discussion of this principle, see Davidson v. St. Louis Transit Co., 211 Mo. 320, 356 et seq., 109 S. W. 583. We rule this point against appellant.

III. Appellant contends that the evidence did not justify submission of the issue of vexatious refusal to pay. It says: "At the time payment was refused the company had the evidence given at the inquest which is conclusive that there was no accidental death."

The testimony, or portions thereof, of two witnesses, Criger and Clarence Morris (respondent), given at the coroner's inquest, is set out in the record. So far as it goes it does not substantially contradict the testimony of those two witnesses given at the trial. For example, Criger did not testify at the inquest that insured, as he approached the track, had his hands in his pockets and his coat collar turned up. He was not asked about those matters. And at the inquest he said that insured, when he came to the track, "looked over his shoulder like that" (indicating) and stopped, instead of saying, as he did at the trial, that insured "checked." But at the inquest Criger also said in this connection that "it was all done so quick I didn't have much time to figure what was going to take place, the train was right at him when he fell, because he hadn't more than hit the track until the train hit him, it was all done in a second of time."

Clarence Morris testified at the inquest that the insured had had a weakness in his legs, about as he testified at the trial, but did not say (was not asked about) whether that condition continued to the time of insured's death, or whether such condition had improved in the

last thirty days preceding insured's death, as he testified at the trial it had. It may be stated further that Clarence Morris' testimony at the inquest negatives the idea that insured may have had the thought of suicide in mind.

At the coroner's inquest the witnesses were not asked or required to give and did not give a detailed and complete description of the occurrence and the accompanying circumstances, as they did at the subsequent trial, nor of other matters not, perhaps, deemed necessary to that inquiry.

In its letter of June 15, 1932, three months after insured's death and before suit was brought, appellant wrote respondent that it had made a "careful investigation," as the result of which it had concluded that the death of insured was not accidental and that it was not liable for and refused to pay the double indemnity. It offered no evidence of what such "careful investigation" revealed, except as shown by the testimony given at the coroner's inquest, upon which alone it seems from its brief to rely. As we have said there was no evidence tending to show suicidal intent on the part of insured. The presumption is the other way. There was no evidence of mental infirmity. As to physical infirmity the testimony of appellant's own witness, Dr. Fullbright, was to the effect that insured's condition had improved in the last month or so before his death, that insured was able to and did go up and downstairs without help and that he, Fullbright, had never heard of insured having fallen. Other evidence on behalf of plaintiff tends to show that for the last month or so before his death insured was apparently able to and did get about without difficulty or apparent indication of weakness such as would likely cause him to fall from physical infirmity. Appellant offered no evidence to refute this testimony. We think the evidence warranted submission of the issue of vexatious refusal to pay.

The foregoing disposes of the questions urged on this appeal. The judgment of the circuit court is affirmed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.