LONNIE W. EDWARDS, Appellant, v. BUSINESS MEN'S ASSURANCE COMPANY OF AMERICA, a Corporation.—No. 38104.—168 S. W. (2d) 82.

Division One, December 15, 1942.

Rehearing Denied, January 19, 1943.

*E. McD. Stevens* and *N. Murry Edwards* for appellant.

670

*Beach, Gordon & Beach* and *Jones, Hocker, Gladney & Grand* for respondent.

DALTON, C.—Action on a policy of accident insurance issued by defendant on the life of plaintiff's husband, Thomas H. Edwards, hereinafter referred to as the insured. Plaintiff, as beneficiary, asked judgment for $7500, plus interest, 10% of said total sum as damages and $2500 as attorneys' fees. The jury returned a verdict for defendant upon which judgment was entered. Plaintiff has appealed.

The issuance of the policy sued on and its terms were admitted. Plaintiff charged that "the insured died on or about the 10th day of July, 1940, as a result of bodily injuries caused through accidental means by gunshot." Defendant admitted the death of insured on the date mentioned, "and that his death was the result of a gunshot wound." Defendant further alleged that the death of insured "was the result of suicide"; that the policy did not cover death by "suicide, while sane or insane"; and that, if recovery was sought on the ground that death resulted from insane suicide, Sec. 5851, R. S. 1939, was "unconstitutional and void and violative of Sec. 28, Art. IV, of the Constitution of Missouri for 1875," because when enacted the title of the bill "did not state, specify or indicate that said bill proposed or purported to legislate with respect to the defense of suicide in actions on policies of insurance on life thereafter issued in the State of Missouri." Plaintiff's reply was a general denial, with a specific denial that "insured's death was the result of suicide," and a further allegation "if insured's death was the result of suicide, it was, insane suicide."

Respondent admits that "plaintiff tried the case both on the theory that death was the result of an accidental gunshot wound and an insane suicide"; and that plaintiff's instructions authorized a verdict for plaintiff "if the jury found that insured's death resulted either from an accidental discharge of the revolver or an insane suicide."

Appellant contends that the trial court committed reversible error in its rulings on the voir dire examination of the jury panel and in giving certain instructions requested by defendant. Respondent denies appellant's contentions and insists that appellant was not prejudiced in any event, because appellant, as plaintiff, failed to make a submissible case for the jury on either theory submitted. The major portion of respondent's brief is devoted to this issue.

Insured was 68 years of age, and resided at Salisbury, Missouri, with his wife, appellant herein. In earlier years he had been a baseball pitcher for a Moberly team and ticket agent for the Wabash Railway Company at Moberly. Later, he moved to Salisbury and be-

came actively interested in a flour mill. The mill closed in 1936. He had twice been mayor of Salisbury and a member of the school board on several occasions. For many years he had been active in civic work. He was a member of a service club and of several fraternal organizations and had long been active in church and Sunday School work.

Insured suffered financial reverses in 1936 and 1937 and left no estate at the time of his death. Prior to 1936, he had "conducted business on a rather big scale." In 1937, after the mill was closed, insured's wife entered the restaurant business in Salisbury and, until about January, 1940, insured sometimes helped her at the cash register. About 1936 insured was indicted and convicted on a charge of embezzlement of wheat, which had been stored under contract with the mill. The conviction was reversed and the cause remanded by this court. State v. Edwards, 345 Mo. 929, 137 S. W. (2d) 447. An amended charge was filed in the circuit court. The cause was continued in May, 1940, because of insured's physical condition, and was still pending at his death.

In the fall of 1939 insured's health began to fail. A cancer developed in the roof of his mouth. He consulted a specialist and also took treatment at the State Cancer Hospital in Fulton. He returned to his home in March, 1940, and remained there until his death. The cancerous condition spread rapidly, until "the back part of his mouth was pretty badly eaten away," and ▬ he could hardly open his mouth. The condition involved the soft palate, right tonsil, and practically all the twelve cranial nerves. His neck and face on the right side were particularly swollen, with some swelling on the left side. His weight decreased rapidly from 165 to less than 120 pounds. Due to impairment of the optic nerve, his eyes became crossed. Thereafter, he complained of double vision and was unable to read. His hearing was impaired to the extent that it was very difficult for him to hear ordinary conversation, and he ceased to listen to the radio. He could talk only with difficulty and there was a gradual change in his ability to carry on a conversation from March, 1940, on down to the time of his death. "He could eat very little, and just as he got worse, he didn't try to eat much." He did, however, watch closely the time for taking his medicines. "He got very little sleep the last few months, being up and down . . . the pain was so great he would wake up and scream out." He was given palliative treatment, sedatives to kill pain, to wit, codeine with aspirin. "On occasions he would have extreme pain and would swirl around on the floor eight or ten times—just keep going in a circle just as fast as he could go, and at the conclusion of that he would fall to the floor" or bed. On one occasion he suddenly jumped up out of bed and ran to the bathroom, then back to the bed and back to the bathroom. After repeating the trip several times he fell on the bed as though he was exhausted. He ceased to have any outside interests. "His thoughts

were very much centered on his own condition'' and what his physician thought of it. For two or three months before his death, he was highly sensitive and nervous. Company ''seemed to upset him and he would start walking backwards and forwards and turning around.'' However, toward his wife and others, he was patient, kind and considerate down to the time of his death.

According to Dr. E. L. Eichhorn, an osteopathic physician, who treated him, the involvment of the cranial nerves was such as to effect his power to think or concentrate. The ''nerve centers didn't function properly at all and he wasn't capable of thinking—concentrating.'' ''His nerves wouldn't coordinate and they wouldn't function properly.'' Over respondent's objection that ''there are no facts detailed on which to express an opinion''; and that ''it is invading the province of the jury,'' Dr. Eichhorn was permitted to testify that in the last month or month and a half of insured's life, the insured was of unsound mind. A subsequent objection that the witness was not qualified was not ruled upon by the trial court, and no objection was made or exception saved to such failure.

On July 4, 1940, plaintiff was at her restaurant and insured was at his home. A Mrs. Adams, who testified for defendant, was at the home helping take care of the insured. According to this witness, about 5 P. M. the insured was in bed. She had just given codeine and aspirin and had gone to her room, when she heard insured get up and run to the bathroom. She went to the bathroom door and listened, but heard nothing and returned to her room. A short time later she heard an explosion and went to the bathroom again. Before she arrived, insured called to her, but she understood only her name. When she reached the door, she found it locked, but insured opened it and said, ''Mary, I have shot myself.'' He then pulled back his pajama coat and showed her the wound, and told her to call his wife and, perhaps, told her to call the doctor.

Plaintiff's witness, Dr. Eichhorn, arrived shortly thereafter. He found a bullet wound three or four inches below the left nipple line. Insured asked if the bullet went clear through his body and was advised that it had. The bullet had entered the upper left portion of the abdomen, below the diaphragm, and had ranged down. It ''emerged latterly to the spine and perhaps an inch or inch and a half below the line it went in on the anterior surface.'' The wound, where the bullet had entered, was about the size of a lead pencil and had a small powder burn around it, ''not much bigger than a dime.'' The bullet had not passed through the pajama coat in front, but had passed through the coat in the back.

The bathroom was about 9 by 10 feet. A chair was kept in the bathroom for insured to sit on, since he was too weak to stand. The bullet, after it had passed through insured's body, had struck the tile at the side of the door facing, some 18 or 20 inches from the floor, and had rebounded into the bathtub, where it was found. The re-

volver, offered in evidence by plaintiff, was found lying on a clothes hamper against the west wall of the bathroom near the wash basin. In the revolver was one loaded and one discharged shell. Three ▮▮ chambers were empty. On the water closet was a dust cloth and beside it was the box the revolver was kept in. In the box were three loaded shells. The revolver had been purchased 30 years before, and had been loaded and put in the box, and was kept in a closet in the bedroom. The dust rag was kept in a hall closet, north of the bathroom door, and had been used every few days to dust the furniture.

Defendant's evidence tended to show that insured immediately after the shooting, said to Dr. F. L. Harms, M. D., "I have shot myself"; that plaintiff said to Dr. Harms, "why in the world would Mr. Edwards do a thing of this kind"; that plaintiff, on being advised as to what had happened, said, "we had anticipated most anything"; that the revolver in question was a 32 caliber "known to the trade as an Iver Johnson safety hammer revolver"; that it could not be discharged by a blow on the hammer, but the trigger had to be pulled back, so as to raise a lifter, and permit the hammer to strike the firing pin; that the powder burns on insured's body showed that "at the time of the firing the muzzle of the gun was in contact with the body"; that the insured was of sound mind and knew what he was doing when the shot was fired; that insured knew and realized the cancer was incurable and had said "he was just abiding his time"; that, frequently, insured would take pieces of dead tissue, white and having a very bad odor, out of his mouth and would say, "isn't that terrible"; that plaintiff submitted proof of loss to one insurance company showing a statement of Dr. Eichhorn with reference to insured's death, as follows: "Self-inflicted gunshot; ranged too low for heart"; that plaintiff submitted a statement to another insurance company showing, "Gunshot wound self-inflicted in abdomen"; that a statement by Dr. Streetor, as attending physician, submitted by plaintiff to defendant company, showed, "Suicide by revolver, shooting self through upper left abdomen"; and that insured's death certificate showed, "Suicide by revolver, shooting self through upper left abdomen."

▮▮ Respondent's theory is that insured was sitting on the chair in the bathroom when the revolver was discharged; that insured "unbuttoned his pajama coat and placed the barrel of the revolver against, and at right angles with, his chest so that the bullet, when the revolver was discharged, would penetrate his heart"; and that insured intentionally caused the discharge of the revolver, while sane, for the purpose of taking his own life. Respondent contends that plaintiff "failed to sustain the burden of proof that insured's death was the result of an accidental discharge of the revolver," and insists that suicide or intentional self-destruction, while sane, was established as a matter of law. We consider first whether plaintiff made a submissible case on the issue of the death of insured as the result of a gunshot wound, accidentally sustained, without regard to insured's

mental condition. If we assume that the gunshot wound which caused insured's death was self-inflicted, while sane, we yet have the question of whether insured knew the revolver was loaded and whether the discharge of the shell and the resulting gunshot wound was intentionally or accidentally self-inflicted. Brunswick v. Standard Accident Ins. Co., 278 Mo. 154, 213 S. W. 45, 49; Reynolds v. Maryland Casualty Co., 274 Mo. 83, 201 S. W. 1128; Trembley v. Fidelity & Casualty Co. (Mo. App.), 243 S. W. 201, 203; Von Crome v. Travelers' Ins. Co., 11 Fed. (2d) 350, 351. In the Brunswick case this court en banc speaking through Faris, J., said: ''When the plaintiff has shown that assured died from cyanide of potassium poisoning self-administered, then the inevitable inference arose that death was caused by either accident or suicide, and plaintiff could not recover if the evidence (aided by the presumption against suicide) yet showed suicide, till there was further evidence adduced showing that such suicide was committed while assured was insane.'' The burden of proof, of course, rested upon plaintiff to show that the death of the insured resulted from accident. Laessig v. Travelers' Protective Assn. of America, 169 Mo. 272, 279-280, 69 S. W. 469, 471; Brunswick v. Standard Accident Ins. Company, supra, (213 S. W. 45, 48); Landau v. Pacific Mutual Life Ins. Company, 305 Mo. 542, 267 S. W. 370, 374; Tillotson v. Travelers' Ins. Company, 304 Mo. 487, 501, 263 S. W. 819; Aufrichtig v. Columbian National Life Ins. Company, 298 Mo. 1, 249 S. W. 912, 914. It was, therefore, incumbent upon plaintiff to prove by the greater weight of the evidence that the gunshot wound which resulted in insured's death was accidentally inflicted and that death resulted from accident, rather than as the result of an act intentionally committed by insured for the purpose of ending his own ■ life. Griffith v. Continental Casualty Co., 299 Mo. 426, 253 S. W. 1043, 1048; (same case, prior appeal) 290 Mo. 455, 235 S. W. 83, 85. Upon the mere proof of the fact that the insured died from the effects of a gunshot wound, to wit, a death by violence, without more appearing, the law presumes the death was an accident or by accidental means, and not intentional. Brunswick v. Standard Accident Ins. Co., supra; Trembley v. Fidelity & Casualty Co. (Mo. App.), 243 S. W. 201, 203; Sellars v. John Hancock Mutual Life Ins. Co. (Mo. App.), 149 S. W. (2d) 404, 405; Gilpin v. Aetna Life Ins. Co., 234 Mo. App. 566, 132 S. W. (2d) 686. Respondent says there is no presumption that insured's death was accidental, because such presumption arises only from an *unexplained* violent death, while the evidence in this case conclusively establishes suicide *as a matter of law*. Of course, if upon the whole evidence the receipt of gunshot wound by the insured was fully explained on some basis other than accident, the burden of going forward with the evidence would be shifted back to plaintiff and, in the absence of further evidence tending to establish accident, the defendant would be entitled to a directed verdict. Landau v. Pacific Mutual Life Ins. Co., supra, (267 S. W.

370, 375); State ex rel. Bowdon v. Allen, 337 Mo. 260, 85 S. W. (2d) 63; Richey v. Woodmen of the World, 163 Mo. App. 235, 146 S. W. 461; Kornfeld v. Supreme Lodge Order of Mutual Protection, 72 Mo. App. 604; Sellars v. John Hancock Life Ins. Co. (Mo. App.), 149 S. W. (2d) 404; Berne v. Prudential Ins. Co., 235 Mo. App. 178, 129 S. W. (2d) 92; Mayhew v. Travelers' Protective Assn. of America (Mo. App.), 52 S. W. (2d) 29; Von Crome v. Travelers' Ins. Co., supra, (11 Fed. (2d) 350, 351).

Respondent insists that the evidence conclusively shows the strongest possible motive for suicide, to wit, a progressive incurable disease, intense pain and suffering, inability to communicate with friends and loved ones, financial reverses, and criminal prosecution; that the fact that the revolver had been loaded and unused for thirty years shows it was taken to the bathroom by insured for use upon himself; that the evidence that no hole was found in the front of the pajama coat and that there was a powder burn about the wound, shows the coat was intentionally pulled back and the barrel of the revolver intentionally placed against the body at right angles near the heart, so that it could be intentionally discharged and produce death; and that the revolver was intentionally discharged, since it could be discharged only by pulling the trigger.

Considered most favorably to the plaintiff, as we must, we think the evidence in this case is not of such character as to exclude a reasonable inference against suicide. No one witnessed the actual shooting. The bathroom door was locked. Insured made no statement to any witness tending to show more than that the wound was self-inflicted. He did not indicate whether he had shot himself accidentally or intentionally. The statement, "I shot myself," was equivocal and open to different interpretations. According to defendant's evidence, certain witnesses immediately reached the conclusion that it was intentional, but their reaction is not conclusive. Under all of the evidence in the case, the statements of different doctors submitted by plaintiff to defendant and other insurance companies was not conclusive on the issue that insured's death was the result of suicide and not accidental. Kirk v. Metropolitan Life Ins. Co., 336 Mo. 765, 81 S. W. (2d) 333, 339; Andrus v. B. M. A., supra, (283 Mo. 442, 223 S. W. 70, 74); Mayhew v. Travelers' Protective Assn. of America (Mo. App.), 52 S. W. (2d) 29, 31. The evidence concerning the circumstances attending the receipt of the wound and the intention, if any, with which it was inflicted is wholly circumstantial. The evidence did not establish as a matter of law that insured's death resulted from suicide, nor did it show the precise circumstances under which the wound was received. There remained plenty of room for reasonable controversy with respect to the true circumstances under which the insured received his mortal wound and, even though self-inflicted, whether it was intentionally or accidentally self-inflicted. The shot was fired on the fourth of July. We take judicial notice of that

date and its significance to the American people and of the fact that firearms are frequently discharged in celebration. Three loaded shells had been removed from the revolver and were found in the box. Why were they removed if insured intended to commit suicide? Not only had the revolver and the box in which it was kept been taken from the bedroom closet to the bathroom, but a dust cloth had been secured from a hall closet. The dust cloth was found on the water closet, ▮▮▮ lying alongside the revolver box containing the three shells. If insured intended to commit suicide, why was the dust rag obtained? There is no suggestion in the evidence that it would have been necessary to dust the weapon before using it to commit suicide. If suicide was intended, and there is no evidence that insured had ever entertained the idea of self-destruction, why was only one shot fired? Why was it directed into the abdomen and downward? The bullet entered the upper left portion of the abdomen, not only below the heart, but below the diaphragm and ranged downward. There is no evidence that insured's pajama coat was buttoned up, when he went into the bathroom, and no evidence that it was intentionally pulled back. The powder burns about the wound were not decisive on the issue of suicidal intent. If insured intended to commit suicide because of the motives referred to by respondent, why was a wound inflicted that would not produce immediate death? Why did insured immediately call Mrs. Adams and go and unlock the door and come out of the bathroom? Why did he say, ''Mary, I have shot myself,'' instead of using words clearly expressing an attempted suicide, that is, an intentional effort to kill himself? The words used do not exclude a self-inflicted gunshot due to accident. Insured's general physical condition, his defective vision, and his spontaneous conduct in fits of pain do not exclude accident, particularly in view of Dr. Eichhorn's testimony concerning the involvment of the cranial nerves and their lack of coordination. ''It is well settled in this state that, where the evidence is wholly circumstantial, suicide cannot be declared, . . . as a matter of law, unless such circumstances exclude every reasonable hypothesis except suicide.'' Parker v. Aetna Ins. Co., 289 Mo. 42, 232 S. W. 708, 714; Griffith v. Continental Casualty Co., supra; Brunswick v. Standard Accident Ins. Co., supra; Reynolds v. Maryland Casualty Co., supra, (274 Mo. 83, 201 S. W. 1128, 1131) ; Prentiss v. Ill. Life Ins. Co. (Mo. Sup.), 225 S. W. 695, 701. Of course, where all the evidence in a case is of such a character that it affords no room for reasonable controversy about an ultimate fact, there can be no issue and therefore nothing concerning such fact for the trier of facts to determine. State ex rel. Bowdon v. Allen, supra, (337 Mo. 260, 85 S. W. (2d) 63, 68).

In the Brunswick case, supra, it is said: ''The presumption against suicide is a rule of law deduced from convenience and necessity; it is based on the well-nigh universal human characteristic of love of life and fear of death, and it arises in a case whenever the cause of

death is in issue and the evidence discloses a state of facts consistent with either accident or suicide. . . . If the evidence in favor of suicide is wholly circumstantial, then it ought to be such and of such weight as to negative every reasonable inference of death by accident.'' (213 S. W. 45, 50.)

Respondent further insists that it is just as reasonable to infer from all the circumstances in evidence that insured's death resulted from an intentionally self-inflicted gunshot wound as that it was the result of an accident, and that plaintiff did not sustain the burden of proof, citing Draper v. Louisville & N. R. Co., 348 Mo. 886, 156 S. W. (2d) 626, 634; Wills v. Berberich's Delivery Co., 345 Mo. 616, 134 S. W. (2d) 125, 130, and other cases. The rule concerning circumstantial evidence is that where facts, proven by the party having the burden of proof, as a matter of law ''give no more than an equal basis to two inconsistent inferences as to an essential fact, such party has failed by his proof to remove his case beyond the realm of speculation and conjecture as to the existence of this essential fact.'' Draper v. L. N. R. Co., supra, (348 Mo. 886, 156 S. W. (2d) 626, 634) ; Bates v. Brown Shoe Co., 342 Mo. 411, 116 S. W. (2d) 31, 33. The only question presented is whether, upon the whole record, there was substantial evidence that insured's death was the result of accident. We think there was, and that the issue was properly submitted to the jury. Brunswick v. Maryland Casualty Co., supra; Griffith v. Continental Casualty Co., supra; Kahn v. Metropolitan Casualty Ins. Co. (Mo. Sup.), 240 S. W. 793; Morris v. Equitable Assurance Society of United States, 340 Mo. 709, 717, 102 S. W. (2d) 569. Of course, the burden was on plaintiff to prove her case. In the Griffith case, supra, this court en banc said: ''If the jury, after hearing all the evidence, were unable to tell whether insured's fall was accidental or intentional, it was because plaintiff had failed to discharge the burden resting upon her of showing by the greater weight of the evidence that it was accidental. And it was just as necessary in this case as in any other that an affirmative finding should be based upon evidence, and not upon guess or conjecture. . . . As already pointed out, the presumption (against suicide) was not evidence to be considered by the jury, but a rule of law to guide the court, and it had served its purpose and gone out of the case when the case was submitted to the jury. While the 'presumption' was gone, there remained, of course, the biological fact that all normal human beings love life, and shrink from death. The recognition of the existence of this fact is a part of common knowledge.'' (253 S. W. 1043, 1048.)

We, therefore, rule against respondent's contention that in any event plaintiff failed to make a case for the jury on the issue of insured's death by accident while sane or regardless of mental condition.

■ Respondent next contends that "the plaintiff did not make a submissible case on the theory of an insane suicide, because there was no substantial evidence that the insured was insane when he shot himself." Respondent insists that "there was no evidence of any abnormal acts or actions on the part of the insured which would warrant or justify a jury in finding that the insured when he shot himself was insane to such a degree or extent that he was unable to understand or appreciate the moral consequences . . . of his suicidal act"; and that there was no evidence "that the insured had ever had any delusions, which are a prerequisite to an opinion of a witness or finding by a jury, of insanity, absent proof of dementia, a loss of the mind or intellect." Respondent relies upon Bensberg v. Washington University, 251 Mo. 641, 660, 158 S. W. 330; Prentiss v. Ill. Life Ins. Co., supra; Harrelson v. Flournoy, 229 Mo. App. 582, 78 S. W. (2d) 895; and other cases. Although there is a presumption of sanity (see, Scales v. National Life & Accident Ins. Co. (Mo. Sup.), 212 S. W. 8; Fendler v. Roy, 331 Mo. 1083, 58 S. W. (2d) 459) that presumption went out of the case because of the evidence of the plaintiff tending to show insured was of unsound mind and the evidence of defendant tending to show insured was of sound mind when the injury occurred. State ex rel. United Mutual Ins. Assn. v. Shain et al., 349 Mo. 461, 162 S. W. (2d) 255, 263. We hold that the testimony of Dr. Eichhorn, concerning insured's mental condition, was sufficient to make a submissible case on the issue of insured's insanity. Travelers' Ins. Co. v. Schenkel, 35 Fed. (2d) 611, 612; 37 Fed. (2d) 254.

■ Appellant insists that the burden of proof to establish the defense of suicide, pleaded by defendant, that is "sane suicide," was upon the defendant, and that "there was no burden on plaintiff in this case to prove that the insured was insane." In the case of Prentiss v. Ill. Life Ins. Co., supra, plaintiff sued on a life insurance policy issued in Illinois. The policy provided only for the return of premiums in event of death by suicide within two years from date of issue. Insured died within 14 months from date of issue and defendant set up the defense of suicide and offered evidence in support thereof. The court said (Div. I) : "In the case at bar, there was the strongest sort of evidence showing that the assured committed suicide, and in the face of such evidence all presumptions disappear, and it is for the jury to determine, under all the facts and circumstances in the case, whether the assured did commit suicide, and on this proposition the burden of proof was upon the defendant insurance company." (225 S. W. 695, 701.) The death of the insured being admitted, the burden was upon defendant to show that death resulted under circumstances constituting an excepted risk in the policy. Parker v. Aetna Life Ins. Co., 289 Mo. 42, 232 S. W. 708, 716. The Parker case was a suit on a life insurance policy issued in California. The defense was that insured committed suicide, sane or insane, within one year from the date of the issuance of the policy. The insured's

death was admitted. The court held the burden of proof was on the defendant to prove suicide, sane or insane, and said: "The plaintiff could recover unless insured committed suicide (that is, unless defendant made good its defense) under plaintiff's instructions, and could not recover if he did (that is, if defendant made good its defense) under defendant's instructions." (232 S. W. 708, 716.)

In the case of Reynolds v. Maryland Casualty Co., supra, plaintiff sued on an accident policy. The question of sanity or insanity was not involved. There was no evidence direct or circumstantial of insanity. In the absence of evidence to the contrary the insured was presumed to be sane. The sole question was whether death was caused by sane suicide or by accident. The evidence in the case was purely circumstantial. The court en banc said: "No legal proposition is more firmly established than that where the act which caused the death may be either accidental or suicidal the burden is upon the insurer to establish the fact of suicide by a preponderance of the evidence, for the presumption arising from the love of life, which is created for its preservation, is, like every natural law, always within the contemplation of the courts." (201 S. W. 1128, 1131.)

In the case of Kahn v. Metropolitan Ins. Co., supra, plaintiff sued on an accident policy. Insured fell from a rowboat and died of shock and strangulation. Defendant did not plead suicide but offered evidence to show suicide. There was evidence tending to show that insured's fall from the boat was due to accident and a clear prima facie case was made for plaintiff. No question of insane suicide was involved. The court en banc said: "While there was evidence introduced tending to prove suicide by the assured, yet there was substantial evidence tending to disprove that fact, and that he died from accidental, external, and violent means, as provided for by the policy. This evidence made a case for the jury . . . And the burden of proving suicide was clearly upon the defendant." (240 S. W. 793, 798.)

In the case of Andrus v. Business Men's Accident Assn., supra, plaintiff sued upon what was termed an accident policy and alleged insured's death by accidental means, to wit, the drinking of carbolic acid. Defendant pleaded suicide. The evidence did "not prove conclusively that insured took the carbolic acid with the intention of committing suicide." No affirmative evidence that insured was insane is referred to, but the issue of insanity was submitted and the court (Div. II) said: "Unless the evidence shows conclusively that the insured was sane, and intentionally took his own life, so that the court might declare as a matter of law that the death was intentional, it was a question for the jury, from such evidence as was produced, to say whether the insured was sane or insane at the time, and whether, if sane, the death was inflicted intentionally or accidentally. . . . The burden was on the defendant to prove that the death under such circumstances was intentional, and not accidental; that is, the burden

would be upon the defendant, in a case of suicide, to prove that the insured was sane, and committed the act which took his life with the intention of committing suicide." (223 S. W. 70, 74.)

In the case of Laventhal v. New York Life Ins. Co., 40 Fed. Supp. 157, it is pointed out that the statement in the Andrus case, supra, is in conflict with the rule that there is a presumption of sanity and that the burden of proof is on plaintiff to prove insanity.

The statement, supra, from the Reynolds case was construed in the Brunswick case, supra, (213 S. W. 45, 50-51) to mean the burden of going forward with the evidence. The statement, supra, from the Kahn case also refers to the burden of going forward with the evidence. No issue of insane suicide was involved in these cases. If the statement, supra, from the Andrus case was not intended to mean burden of going forward with the evidence, it has been overruled by the Griffith and other cases, supra.

The burden of proof, to establish the insanity of the insured, rested upon the plaintiff, because on this theory of the case, if the death of the insured resulted from suicide, there could be no recovery unless it was further shown to be an insane suicide, and, therefore, accidental. Scales v. National Life & Accident Ins. Co., supra, (212 S. W. 8, 9); Aufrichtig v. Columbia National Life Ins. Co., supra, (249 S. W. 912, 914). See, instruction approved in Andrus v. Business Men's Accident Assn. of America, supra, (223 S. W. 70, 74-75); Brunswick v. Standard Accident Assn., supra, (213 S. W. 45, 49); Fendler v. Roy, supra, (58 S. W. (2d) 459, 464).

█ Respondent further contends that plaintiff cannot recover because the policy sued on expressly excludes recovery for death by suicide, "while sane or insane," and that Sec. 5851, R. S. 1939, excluding such defense is unconstitutional for the reasons heretofore stated. Respondent raises the issue here in an effort to sustain the judgment of the trial .court, because it is respondent's position that, regardless of errors in instructions and otherwise, plaintiff made no case for the jury on the issue of insane suicide. If the section, supra, █ was unconstitutional and void, then, since the contract sued on expressly excepted liability if insured's death was the result of an insane suicide, appellant was not prejudiced by the alleged errors in instructions, because the trial court should have sustained the special demurrer to this theory of the case. St. Charles Savings Bank v. Denker, 275 Mo. 607, 621, 623, 205 S. W. 208; O'Connell v. Dockery (Mo. App.), 102 S. W. (2d) 748, 750(5). The statute supra, invalidates an insane suicide exception in an accident policy. Brunswick v. Standard Accident Ins. Co., supra; Scales v. National Life & Accident Ins. Co., supra. The constitutionality of the particular statute has been frequently attacked, but not upon the ground of failure to comply with Sec. 28, Art. IV. See, Andrus v. Business Men's Assn., supra, (223 S. W. 70, 72); Lukens v. International Life

Ins. Co., 269 Mo. 574, 588, 191 S. W. 418; Ordelheide v. Modern Brotherhood of America, 226 Mo. 203, 125 S. W. 1105.

The so-called suicide statute first appeared in an act approved May 24, 1879. The act is entitled, "An Act to revise and amend the Insurance Laws of the State of Missouri. Be it enacted by the General Assembly of the State of Missouri as follows:" It appears at p. 849 of a bound volume (handwritten and titled "Laws of Missouri 1879, 30th General Assembly") in the office of the Secretary of the State of Missouri. It does not appear in the printed session acts, Laws of Missouri, 1879. The Act contained 147 sections. Sec. 63, at page 867, reads as follows:

"In all suits upon policies of insurance on life hereafter issued by any company doing business in this State, it shall be no defense that the insured committed suicide, unless it shall be shown to the satisfaction of the court or jury trying the cause, that the insured contemplated suicide at the time he made his application for the policy, and any stipulation in the policy shall be void."

Sec. 147 reads as follows: "All acts and parts of acts inconsistent with this act are hereby repealed."

The insurance laws of the state at the time of this enactment contained a provision with reference to defenses in case of suits on life insurance policies, as follows: "In suits brought upon life (insurance) policies heretofore or hereafter issued, no defense based upon misrepresentation in obtaining or securing the same shall be valid, unless defendant shall, at or before the trial, deposit in court, for the benefit of the plaintiffs, the premiums hereafter received on such policies." Laws of Missouri, 1874, p. 89, Sec. 2. This section was included as Sec. 58 of the Act of 1879, supra, at page 865 of the handwritten volume, supra, and became Sec. 5988, R. S. 1879. By section 63, supra, of the Act of 1879, a further defense in suits on life insurance policies, to wit, the defense of suicide, was cut off, except under the circumstances stated.

Respondent contends that "the title to the bill made no mention whatever that the bill was to deal with the subject of suicide in any respect"; that the "bill manifestly failed to express the subject contained in the body of the bill"; and that there was no suicide statute to be revised or amended. Respondent says: "If new and additional laws can be enacted by incorporating them in a bill to revise and amend existing laws, then the purpose of Sec. 28, Art. IV of the Constitution may be destroyed and circumvented and new and important legislation may be enacted without notice thereof to members of the General Assembly or to the people." Respondent further contends the insufficiency of the title was not cured by the 1899 amendment, Laws 1899, p. 243, since the original enactment was only referred to by the section number, without reference to its content. Respondent cites Sherrill v. Brantley, 334 Mo. 497, 502, 66 S. W. (2d) 529, and other cases.

The purpose of the constitutional provision, supra, has been stated as follows: "First to prevent hodge-podge or 'log rolling' legislation; second, to prevent surprise or fraud upon the Legislature by means of provisions in bills of which the titles gave no intimation, and which might therefore be overlooked and carelessly and unintentionally adopted; and, third, to fairly apprise the people, through such publication of legislative proceedings as is usually made, of the subjects of legislation that are being considered, in order that they may have an opportunity of being heard thereon, by petition or otherwise, if they shall so desire." State ex rel. United Railways Co. v. Wiethaupt, 231 Mo. 449, 459, 133 S. W. 329; Southard v. Short, 320 Mo. 932, 8 S. W. (2d) 903.

In the case of State v. Hurley, 258 Mo. 275, 278, 167 S. W. 965, the court said: "The purpose of the constitutional provision (Sec. 28, Art. 4, Const. Mo.) is that the title shall generally indicate what the act contains, and by the terms, 'generally indicate' we mean that it shall refer in a comprehensive manner to the subject-matter of the enactment, but it need not necessarily refer to subordinate matters connected therewith or reasonably within the purview of the statute."

The provision requires that matters which are incongruous, disconnected and without natural relation to each other must not be joined in one bill, and the title must be a fair index of the matters in the bill. State ex rel. Niedermeyer et al. v. Hackmann, 292 Mo. 27, 31, 237 S. W. 742. It does not prevent the inclusion in one bill, under one general title, of subjects naturally and reasonably related to each other. St. Francis Levee Dist. of Missouri v. Dorroh, 316 Mo. 398, 414, 289 S. W. 925; Gross v. Atchison County, 320 Mo. 332, 337, 8 S. W. (2d) 887; State ex inf. Barrett ex rel. Bradshaw v. Hedrick, 294 Mo. 21, 62, 241 S. W. 402, 415; Nalley v. Home Ins. Co., 250 Mo. 452, 469, 157 S. W. 769. "The law does not require each separate legislative thought to be embodied in a different bill, when they have a natural connection with each other." Thomas v. Buchanan County, 330 Mo. 627, 636, 51 S. W. (2d) 95. "The evident object of the provision of the organic law relative to the title of an act was to have the title like a guide board, indicate the general contents of the bill, and contain but one general subject which might be expressed in a few or a greater number of words. If those words only constitute one general subject; if they do not mislead as to what the bill contains; if they are not designed as a cover to vicious and incongruous legislation, then the title can stand on its own merits, is an honest title and does not impinge on constitutional prohibitions." St. Louis v. Weitzel, 130 Mo. 600, 616, 31 S. W. 1045; Asel v. City of Jefferson, 287 Mo. 195, 204, 229 S. W. 1046, 1048. The mere generality of the title will not prevent the act from being valid, where the title does not tend to cover up or obscure legislation which is in itself incongruous and has no necessary or proper connection, and in case of an

amendatory act a requisite of congruity is that such act shall pertain to and admit of being made a consistent part of the law to be amended. State v. Mullinix, 301 Mo. 385, 390, 257 S. W. 121.

The constitutional provision simply requires that the title shall give information of the general subject of the act. While it may be so general in its terms as to omit matters germane to the principal features of the statute, if it sufficiently indicates the substantial purpose of the law, it will not be violative of the Constitution. State v. Sloan, 258 Mo. 305, 313, 167 S. W. 500; State ex inf. Barrett v. Imhoff, 291 Mo. 603, 238 S. W. 122, 126.

We hold that the exclusion of a further defense in case of suits on life insurance policies, to wit, the defense of suicide by Sec. 63 of the Act approved May 24, 1879, was an amendment of the then existing insurance laws of the State of Missouri, and was within the title of the act. The title was indeed general, but it indicated the substantial purpose of the act, and was sufficient to appraise the public and the members of the General Assembly of its purpose. Section 63, supra, constituted an amendment of the existing insurance laws of the state. It was germane and appropriate to the title of the act. The title was comprehensive, it did not descend into particulars. The further limitation of defenses in case of suits on policies of life insurance was reasonably within the purview of the act, and the subject thereof was sufficient to give notice to those specially interested therein of the legislative purpose of the act. Such further limitation would admit of being made a consistent part of the insurance law of the state, which the act purported to amend. The act did not violate the constitutional provision prohibiting a bill from containing more than one subject, which shall be clearly expressed in its title.

█ Respondent next insists that in no event could the cause be submitted on the theory of accidental death while sane (or regardless of mental condition) and, also, upon insane suicide. Respondent says: "A self-inflicted or suicidal death is the antithesis of an accidental death, because it is an intentional death," and respondent insists that its motion to elect should have been sustained. Respondent overlooks the fact that many accidental injuries are self-inflicted. A person may shoot himself, cut himself or take poison by accident and the resulting injury or █ death be self-inflicted, but wholly unintentional. Again, respondent uses the word "suicidal" in the sense of intentional self-destruction while sane, but an insane suicide is not truly suicide, because an insane intent or insane impulse resulting in the action causing death is no intention at all, and, therefore, death by insane suicide is accidental. Aufrichtig v. Columbian National Life Ins. Co., supra, (249 S. W. 912, 914). Only one cause of action was pleaded and only one cause of action was submitted. There was evidence in the record from which a jury could find that insured's death resulted from accident upon either of the two theories submitted by plaintiff. Evidence of the insanity of the insured was

not inconsistent with plaintiff's first theory of accidental death. The death of an insane person may be caused by accident, and without the accident being an insane suicide. Except on the issue of mental condition there is little conflict in the evidence, but very different inferences can be drawn from the evidence. While it is true that some of the facts in evidence were not essential to each of the two theories of accident submitted, plaintiff was only required to establish her right to recover on one of the two theories. The facts necessary to make out one theory of accidental death did not necessarily disprove or contradict the state of facts necessary to support the other theory. Respondent relies upon statements in the Griffith and Landau cases, supra, to the effect that, if a death is accidental, it is not suicidal. In those cases there was no issue of insane suicide and the word "suicidal" was, of course, used in the sense of intentional self-destruction while sane. There is nothing in the pleading or evidence to prevent plaintiff from submitting her cause upon either or both of the two theories of accidental death. The motion to elect and the general and special demurrers were properly ruled. Plaintiff was not required to elect on which theory of accidental death she would submit her cause. She could submit her cause on either or both theories. The one was not inconsistent with the other, nor was proof of one necessarily destructive of the other. See, Williams v. St. Louis Public Service Co., 335 Mo. 335, 73 S. W. (2d) 199, 203; State ex rel. Thompson v. Shain, 349 Mo. 27, 159 S. W. (2d) 582, 588; Montague v. M. & K. I. R. Co., 305 Mo. 269, 264 S. W. 813, 817; Beal v. C., B. & Q. R. Co. (Mo. Sup.), 285 S. W. 482; State ex rel. Tunget v. Shain, 340 Mo. 434, 101 S. W. (2d) 1, 4. We must therefore, further examine the record to determine whether errors were committed which were prejudicial to appellant.

Appellant assigns error on the court's action in discharging certain jurors peremptorily challenged by defendant after they stated that they believed that a man who committed suicide was insane. A number of jurors were discharged, some of them after they had further stated that they would follow the evidence and instructions regardless of their belief. Appellant relies particularly on McComas v. Covenant Mutual Life Ins. Co., 56 Mo. 573, 574, 576, wherein it is stated as follows: "The only material defense relied on to the merits of the action was, that the husband committed suicide, in violation of the terms of the policy. The matter in dispute was, whether the deceased was insane when he killed himself. . . . In the progress of impaneling the jury the counsel for defendant asked them the question 'whether the jury has any opinion upon the question whether a man is necessarily insane who commits suicide?' This question was objected to by plaintiff's counsel and the court sustained the objection, and to this action of the court in refusing to permit that question to be asked, and in refusing to permit the jury to answer the same the defendant duly excepted. . . . The question put to the jury in

regard to their opinion on the subject of insanity was properly ruled out by the court. The mere opinion of a juror does not of itself render him incompetent. It must be such as might influence his judgment. The question did not comprehend the essential ingredient as to whether he had formed an opinion which might influence his judgment." The holding is not decisive on the assignment of error here presented.

After a careful reading of the record before us, we have reached the conclusion that, from the examination of the jurors by counsel and by the court, the court could have properly reached the conclusion that each of the jurors excused had such a firm conviction that a man who committed suicide was insane, that such conviction would in fact influence his judgment, and require evidence to remove it. The record fails to show an abuse of the court's discretion in discharging the jurors. State v. Poor, 286 Mo. 644, 228 S. W. ▆ 810, 814; Rose v. Sheedy, 345 Mo. 610, 134 S. W. (2d) 18, 19; Parlon v. Wells, 322 Mo. 1001, 17 S. W. (2d) 528, 532.

▆ Appellant assigns error on the giving of instructions numbers 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14 and 15 requested by defendant. Instructions 8, 9 and 10 each assumed as a matter of law that the insured committed suicide, and, on the facts therein submitted, each directed a verdict for defendant. These instructions were in direct conflict with plaintiff's instruction number 1, submitting the issue of insured's death through accidental means without reference to insured's mental condition, and they necessarily excluded a consideration of that theory. Respondent contends these instructions "properly assumed that insured's death was suicidal" because plaintiff didn't make a case of accidental death for the jury and because suicide was established as a matter of law. In view of our holdings to the contrary, supra, these instructions were clearly erroneous.

▆ Appellant further complains of instruction 8 because it expressly directed a verdict for defendant, unless the jury found "that at the time the insured shot himself he was insane to such a degree as not to be able to know or understand the moral consequences of his act." Instructions 9, 10, and 14 submitted the same test of mental condition in order to establish accident by proof of an insane suicide. Appellant contends the test is erroneous and says that "understanding the moral consequences of the act has never been a test for determining insanity in this type of case"; and that the instructions erroneously excluded any consideration of an insane impulse which the insured could not resist. Appellant relies particularly on the Andrus case, supra, (223 S. W. 70, 74) and the case of Gates v. Travelers' Ins. Co. (Mo. App.), 218 S. W. 927, 928. Respondent relies on Rodgers v. Travelers' Ins. Co., 311 Mo. 249, 261, 278 S. W. 368, however the case does not support respondent's position, since the test set forth in instructions 8, 9, 10 and 14 given at defendant's request do not meet the requirements of instruction C, approved in the Rodgers case, (311

Mo. 249, 256, 261). The instructions are accordingly erroneous and particularly so in that they entirely omit the idea that insured's will power might have been so reduced that he could not resist an insane impulse to take his life, if he did so. See, Rubinstein v. New York Life Ins. Co. (Mo. App.), 153 S. W. (2d) 760, 765; Laventhal v. New York Life Ins. Co., 40 Fed. Supp. 157, 159.

Appellant complains of instruction 6, because it told the jury that "a self-inflicted or suicidal death is not an accidental death," and that it is "only when the insured is insane that his suicidal or self-inflicted death would become an accidental death." We have seen, supra, that a self-inflicted injury or death may be either accidentally or intentionally self-inflicted. The use of the words "self-inflicted or suicidal" was misleading under the facts of this case, although the words "self-inflicted" are sometimes used in the sense of intentional self-inflicted while sane. The instruction is erroneous. Parker v. Aetna Life Ins. Co., supra, (232 S. W. 708, 714).

Appellant complains of Instruction 7. This instruction advised the jury "that sane men sometimes commit suicide and you cannot find that the insured was insane merely because he shot himself." Appellant says the instruction singles out a particular fact, and is a comment on the evidence, citing C. I. T. Corp. v. Hume (Mo. App.), 48 S. W. (2d) 154, 157; Lithegner v. City of St. Louis (Mo. App.), 125 S. W. (2d) 925, 933; Simpson v. Burnett, 299 Mo. 232, 252 S. W. 949, 954. Respondent has not attempted to answer the criticism, since it has devoted little space in its brief to answering the criticism of its instructions. We think the instruction merely cautionary and the giving or refusal of it was within the discretion of the trial court.

Appellant further contends that instructions 8, 9, 10, and 14, for a total of six times, repeated the erroneous test for determining whether or not the insured was insane; that instructions 5, 8, 9 and 11 told the jury the burden of proof was on the plaintiff; and that instructions 6, 7, 8, 9, 10 and 14 submitted the issue of insanity six times. Appellant says these several repetitions were highly prejudicial and over emphasized the particular issues. Appellant cites, Fantroy v. Schirmer (Mo. App.), 296 S. W. 235, 238; Reeves v. Lutz, 191 Mo. App. 550, 556, 559, 177 S. W. 764; Sidway v. Missouri Land & Livestock Co., 163 Mo. 342, 63 S. W. 705; Johnson v. Springfield Traction Co., 176 Mo. App. 174, 161 S. W. 1193. Undue repetitions in instructions ■ and undue emphasis on particular matters are to be avoided, but the rule is that the question of repetition in instructions and duplication of instructions and the prejudicial affect, if any, on the adverse party is to be determined in the first instance by the trial court and if, by overruling the motion for a new trial, the court determines the issue of prejudice adversely to appellant this court will not disturb the judgment, unless it appears that the trial court has abused its discretion. Wells v. City of Jefferson, 345

Mo. 239, 245, 132 S. W. (2d) 1006, 1009; Hulsey v. Tower Grove Quarry & Construction Co., 326 Mo. 194, 215, 30 S. W. (2d) 1018, 1028; Mayes v. Mayes (Mo. Sup.), 235 S. W. 100, 107. In view of the fact that the cause must be retried, it is unnecessary to determine whether the repetitions were of such a character as to show prejudice to appellant and an abuse of the trial court's discretion.

Assignments of error as to other instructions are not briefed nor referred to in argument and will be considered abandoned.

The judgment is reversed and the cause remanded. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur except *Hays, J.,* absent.